**IOWA CONTRACTORS WORKERS' COMPENSATION GROUP, Appellee,**

v.

**IOWA INSURANCE GUARANTY ASSOCIATION, Appellant.**

No. 88–96.

Supreme Court of Iowa.

March 22, 1989.

---

Kent M. Forney and Robert N. Helmick of Bradshaw, Fowler, Proctor & Fairgrave, Des Moines, for appellant.

John A. Templer, Jr., and Ronni F. Begleiter of Shearer, Hintze & Templer, P.C., West Des Moines, for appellee.

Considered by HARRIS, P.J., and LAVORATO, NEUMAN, SNELL, and ANDREASEN, JJ.

LAVORATO, Justice.

In this declaratory judgment action, the Iowa Contractors Workers' Compensation Group (Group) asked the district court to rule that the Iowa Insurance Guaranty Association (Association) was liable for unpaid

claims owed to the Group by an insolvent insurance company. The district court decided that the Association was indeed liable. We agree and affirm.

## I. *Background Facts and Proceedings.*

In Iowa a number of statutory provisions establish a comprehensive scheme to provide statutory benefits to injured Iowa workers. *See* Iowa Code chs. 85, 85A, 85B, 87 (1987). Iowa Code section 87.1 guarantees that employers will have sufficient funds to pay these benefits. It does so by requiring employers to obtain workers' compensation liability insurance. *See id.* § 87.1. This requirement has been a part of workers' compensation law since its inception.

Recognizing that some employers by themselves could fund compensation benefits, the legislature has permitted them to qualify as self-insurers. As self-insurers, these employers are exempt from the statutory requirement to purchase workers' compensation insurance. *See id.* §§ 87.4, 87.5, 87.11.

In addition, individual employers who do not have sufficient assets to qualify as self-insurers are permitted to combine their assets and form self-insurance associations to provide benefits for their employees. *See id.* § 87.4. An employer satisfies the statutory requirements for workers' compensation insurance by evidence of the employer's membership in, and payment of premiums to, the self-insurer association. *Id.*

In 1979, acting pursuant to section 87.4, the Master Builders of Iowa and the Associated General Contractors formed the Group to provide workers' compensation benefits for employees of member contractors. The Iowa insurance commissioner approved the formation of the Group as required by section 87.4.

The Group engaged a service company to process claims and to run its day-to-day operations. Thus, the premiums paid by the employer members were intended to cover not only workers' compensation claims but also the service company's fees and other administrative costs.

Eligible contractors could apply for membership in the Group. Upon acceptance, a member of the Group entered into a liability agreement with the Group. This agreement provided that the Group would "pay promptly when due the benefits" required of the member by the workers' compensation laws. The agreement also provided that the Group was "directly and primarily liable to any person entitled to the benefits payable" under the agreement.

Pursuant to the liability agreement, members were assessed premiums for their workers' compensation coverage. The assessments were based on the particular employer's previous workers' compensation losses. The members' assessments were placed in a fund for the payment of workers' compensation to injured employees of the members.

In addition, the Group and its members entered into a separate indemnity agreement under which they agreed to be jointly and severally liable for any payments the assessment fund could not cover. Consequently, each member retained the financial risk of loss, not only for claims by its own employees, but also for claims by the employees of other members of the Group.

After its inception, the Group began purchasing an annual excess workers' compensation policy to protect against a catastrophic loss or a large accumulation of losses in a single year. Such a policy would protect the Group if specific or total losses in a policy year exceeded a "deductible" amount. This amount would usually be defined as a certain percentage of the members' paid assessments. The excess policy thus reduced the members' risk of joint and several liability.

In 1985 the Group purchased this type of insurance from the Mission Insurance Company (Mission), a California-based insurer that had been licensed in Iowa since 1964 under Iowa Code chapter 515. During negotiations with the Group regarding coverage, Mission indicated concerns about the risk of insuring some of the Group's members. Mission wanted its coverage to begin when the workers' compensation claims ex-

ceeded 100% of the annual gross assessments paid by the Group's members.

The Group balked at the 100% attachment point because it would have left the Group without funds to cover operating and administrative expenses. A compromise was reached when Mission agreed to issue the policy if another company could be found to reinsure Mission for the difference between 80% and 100% of the Group's annual gross assessments. Under such a reinsurance agreement, the second insurer would reimburse Mission for all amounts Mission paid to the Group as a result of claims exceeding 80% of the Group's annual gross assessments; the reinsurer's liability would end when claims rose to 100% of those assessments.

Neither Mission nor the Group was able to find a second insurer to cover the twenty percent "gap" between the differing attachment points desired by Mission and the Group. At the time, the trade associations that had formed the Group were joint owners of an insurance company known as White Oak. As a last resort, it was agreed that White Oak would provide reinsurance to Mission. Under the agreement between the two insurance companies, Mission would cover all claims exceeding eighty percent of the Group's annual gross assessments. Mission would then have the right to recover from White Oak the amount of payments made until the claims exceeded 100% of such assessments.

For the year beginning January 1, 1985, Mission issued the Group a policy of "specific excess" and "aggregate excess" workers' compensation insurance. The specific excess provision covered liability resulting from each occurrence in the policy period. The aggregate excess provision covered liability from all occurrences during the policy period.

Under the policy's specific excess coverage, the Group retained liability for losses in the amount of $300,000 for each occurrence. Mission was liable under this provision for losses up to $9,000,000 for statutorily imposed liability to employees and $1,000,000 for negligent acts.

Under the aggregate excess coverage, the Group retained liability for losses in an amount equal to eighty percent of the annual gross assessments collected for 1985 from the Group's members, with a minimum retention amount of $1,200,000. In other words, the Group was liable either for losses up to an amount equal to eighty percent of the members' annual gross assessments for 1985 or for losses up to $1,200,000, whichever amount was greater. Mission's aggregate excess limit of liability was $2,000,000 beyond the amount of liability retained by the Group.

The Group paid a premium of $112,000 for this policy. Mission paid Iowa premium taxes on the $112,000 premium pursuant to Iowa Code sections 432.1 and 515.24.

In 1985 workers' compensation claims against the Group far exceeded the deductible amount under the Mission policy, thus obligating Mission under both the "specific excess" and "aggregate excess" portions of the policy. Mission, however, went into conservatorship in late 1985 and, after being declared insolvent in February 1987, was placed in liquidation. The California Department of Insurance, as liquidator, instructed the Group to submit its claims against Mission to the Iowa Insurance Guaranty Association.

The Association was created in 1971 by Iowa Code section 515B.3. All insurance companies licensed to do business in Iowa under either chapter 515 or 520 are automatically members of the Association. Iowa Code §§ 515B.2(4), 515B.3 (1987). When a member of the Association becomes insolvent, the Association is supposed to pay claims against the insolvent member by assessing other member insurers the amounts necessary for such payments. *Id.* § 515B.5(1). Mission, as a chapter 515 licensee, was a member of the Association. The Group was not.

The Group presented its claims to the Association, as directed by Mission's liquidator, but the Association refused to pay. The Group then brought this declaratory judgment action.

The district court declared that the Association was liable for the claims made by

the Group. In doing so, the court ruled against the Association on four issues.

First, the court determined that the Mission policy was "direct insurance" within the meaning of Iowa Code section 515B.1, and not reinsurance. The court's determination triggered the application of chapter 515B to the Group's claims. Second, the court refused to recognize the Group as an insurer or underwriting association within the meaning of Iowa Code section 515B.2(3), which excludes claims of such entities from the provisions of Iowa Code chapter 515B. Third, the court rejected the Association's contention that only workers employed by the Group were covered by the Mission policy. Finally, the court concluded that a subrogation provision in the Mission policy did not inure to the benefit of the Association.

The Association appealed, challenging the district court's ruling on all four issues. Our review is de novo. Iowa R.App.P. 4.

## II. *Is the Mission Policy Direct Insurance or Reinsurance?*

The Association contends it is not liable for claims filed by the Group. To support this contention, the Association argues that the provisions of Iowa Code chapter 515 make it liable only for claims made under policies of direct insurance. Because the Mission policy is not direct insurance, but instead reinsurance, the argument continues, the Association is not liable.

A. *Direct insurance.* The Association's position implicates several provisions in Iowa Code chapter 515B, the Insurance Guaranty Association Act. As the name implies, the Act simply provides a mechanism for the payment of unpaid claims against insolvent insurance carriers. Section 515B.1 of the Act describes its scope. According to this section, the Act's provisions apply to "all kinds of direct insurance authorized to be written by an insurer licensed to operate in this state under chapter 515 or chapter 520," with certain exceptions not pertinent here. Iowa Code § 515B.1. "Direct insurance" is not defined in the Act.

The Association was created by section 515B.3. All insurers licensed to transact insurance business under either chapter 515 or chapter 520 are automatically members of the Association. *See id.* §§ 515B.1, 515B.2(4), 515B.3. The parties concede that Mission was so licensed and was a member of the Association both at the time the policy was issued and when the losses occurred.

The Association is obligated by the Act to pay all covered claims against insolvent members to the extent and amount set out in section 515B.5(1)(a). A "covered" claim is defined in the Act as an unpaid claim arising out of and within the coverage of the policy issued by the insolvent member. *Id.* § 515B.2(3). A covered claim does not include "an amount due any reinsurer, insurer, ... or underwriting association, ... or self-insured portion of the claim." *Id.*

The direct insurance argument urged by the Association was rejected under substantially similar circumstances in *Zinke–Smith, Inc. v. Florida Insurance Guaranty Association, Inc.,* 304 So.2d 507, 508–09 (Fla.App.1974). Florida's guaranty association statute, like Iowa's, is patterned after the National Association of Insurance Commissioners (NAIC) Model Act. Zinke–Smith, a single self-insured employer, sued the Florida Insurance Guaranty Association to recover a loss that the employer suffered when its excess insurer became insolvent. The *Zinke–Smith* policy was substantially similar to the Mission policy because it required the excess insurer to reimburse the employer directly for all payments under the policy.

■ Like Iowa's Guaranty Association Act, the Florida statute covered only direct insurance but did not define it. The Florida court defined "direct insurance," as used in the Florida statute, as "an insurance contract between the insured and the insurer which has accepted the risk of a designated loss to such insured, which relationship is direct and uninterrupted by the presence of another insurer." *Id.* at 508. The court quickly recognized that the excess policy met this test. *Id.* We approve

of, and adopt, the Florida court's definition of direct insurance.

■ The Association apparently has no quarrel with this definition of direct insurance but argues there is no direct relationship between Mission and the members of the Group. It points out that in *Zinke–Smith* the policy was issued directly to a self-insured employer and that the insurer was directly obligated to the employer under the terms of the policy.

In contrast, the Association argues, the relationship between Mission and the members of the Group was not direct, but was interrupted by the Group. To support its argument, the Association points to two factors: (1) under Mission's policy, Mission was only obligated to the Group, the insured under the policy, but not to its members; and (2) the liability agreement between the Group and its members specifically provided that the Group was directly and primarily liable to its members.

As the Group properly points out, the Association's argument focuses on the wrong relationship. The relevant relationship, we think, is between Mission and the Group. The only insurance contract at issue here is between Mission, as the insurer, and the Group, as its insured. The Mission policy was not interrupted by the presence of another insurer. We see no significant difference between a single self-insured employer and a group of self-insured employers. In both instances, the insurer's relationship is with the employer or the group of employers, and not with the individual employees.

Given the objectives of chapters 87 and 515B and their interrelationships, we think the Association's distinction in treatment based on whether a single employer or a group of employers purchases excess insurance would produce a result not intended by the legislature. Iowa Code chapter 87 has the laudable objective of insuring payment of injured workers' claims whether the employer purchases insurance or is self-insured. Chapter 515B has a similar, laudable objective: insuring payment of such claims when self-insured employers purchase excess coverage. The Associa-

tion's distinction would frustrate those objectives and be contrary to our long-established rule that favors broad interpretation of workers' compensation coverage. *See Teel v. McCord,* 394 N.W.2d 405, 406–07 (Iowa 1986).

We hold that the Mission policy meets the requirements of Iowa Code section 515B.1. It is direct insurance according to our adopted definition of direct insurance, and it was written by an insurer licensed to operate under Iowa Code chapter 515. *See* Iowa Code § 515B.1.

B. *Reinsurance.* The Association characterizes the Mission policy as reinsurance and, therefore, not within the scope of Iowa Code section 515B.1. We do not agree. The Mission policy is what it purports to be, excess liability insurance.

■ In his treatise on insurance, Appleman takes the position that a contract by a self-insurer for excess coverage is not reinsurance but merely a policy for excess insurance with a deductible or stated amount of retention. 7B J.A. Appleman, *Appleman on Insurance* § 4601, at 184 (W.F. Berdal ed. 1979); *accord Zinke–Smith,* 304 So.2d at 508–09. This characterization by Appleman tracks the definition of "excess insurance" from L.E. Davids, *Dictionary of Insurance* 96 (1977):

> [a] policy ... covering the insured against certain hazards, which applies only to loss or damage in excess of a stated amount. The risk of initial loss or damage, so excluded in the excess policy ... may be carried by the insured himself or may be insured by another policy ... which is known as primary protection.

The terms of the Mission policy bring it clearly within this definition. For example, Section II of the policy entitled "Specific Excess Coverage" provides:

> As respects loss which the [Group] sustains as a result of each occurrence, the *[Group] shall retain* under this Section II *loss in the amount of the retention specified in Item 6(a)* of the schedule and *[Mission] hereby agrees to indemnify the [Group] against loss in excess of*

*such retention,* subject to the policy limit specified in item 6(b) of the Schedule. (Emphasis added.) The retention amount specified in Item 6(a) of the schedule is $300,000. The loss, in excess of this retention amount, against which Mission agreed to indemnify the Group is $9,000,000.

Moreover, the specific excess and aggregate excess provisions of the Mission policy track the requirements of administrative regulation 56.3(2) concerning workers' compensation group self-insurance. The regulation pertinently requires a self-insured group to maintain excess insurance of not less than $3,000,000 per occurrence and limits a retention to one "generally available to associations with similar exposures and annual premiums." 191 Iowa Admin. Code 56.3(2)(b). The regulation also requires the group to

> [m]aintain annual aggregate excess insurance with limits above the aggregate retention of not less than $2,000,000, with an aggregate retention no greater than the estimated earned normal premium collected in the policy year less all estimated expenses during the year including excess insurance premiums.

191 Iowa Admin.Code 56.3(2)(c).

Of course, our conclusion that the Group is not an insurer for chapter 515B purposes fully answers the Association's reinsurance argument. Mission did not insure another insurer—the hallmark of a reinsurance contract. *See* Davids, *Dictionary of Insurance* 218.

Moreover, according to the evidence, Mission certainly believed it was writing excess insurance and not reinsurance. It paid a premium tax on the full amount of the Group's premium. Under Iowa Code section 515.24 it was exempt from paying tax on reinsurance premiums. Further, Mission was prohibited from writing reinsurance under reinsurance treaties with reinsurers with which Mission had reinsured its own undertakings. According to the testimony of a Mission representative, Mission was not set up to write reinsurance but was set up to write excess workers' compensation insurance for self-insured employers.

The district court correctly concluded that the Mission policy was direct insurance rather than reinsurance.

### III. *Is the Group an Insurer and Underwriting Association?*

The Association next contends that it is not liable for the claims in question because the Group is an insurer and an underwriting association. In support of this contention, the Association points to the provisions of Iowa Code section 515B.2(3), which, as we noted, excludes from the definition of "covered claims" an amount due any insurer or underwriting association.

■ A. *Insurer status.* For the purposes of the Guaranty Association Act, "an insurer means an insurer licensed to transact business in this state under either chapter 515 or chapter 520, either at the time the policy was issued or when the event occurred." Iowa Code § 515B.2(4). Under this narrow definition, the Group is clearly not an insurer. It is not licensed to transact business in this state under either chapter 515 or chapter 520. The legislature may be its own lexicographer, and when it chooses to do so we are bound by its definitions. *Cedar Rapids Community School Dist. v. Parr,* 227 N.W.2d 486, 495 (Iowa 1975).

The narrow definition of insurer in section 515B.2(4) is a statutory manifestation of legislative intent to provide guaranty fund protection not only to single self-insurers but also to self-insured groups like the Group. There are other such manifestations. These include the genesis of the Guaranty Association Act itself, administrative regulations, and statutory amendments to chapter 87.

Because our Insurance Guaranty Association Act is patterned after the NAIC Model Act, we think construction of the Model Act by its drafters is persuasive as to the meaning of our own Act. The NAIC 1983 Study Committee on this subject, after a year's work, submitted a report to the NAIC about self-insured workers' compensation groups like the Group.

According to the report, about one-half of the states permit these groups. *See* II NAIC Proceedings 742 (1983). At two different places in the report, the Committee unequivocally noted the availability of insurance guaranty association fund protection if a group's excess carrier were to become insolvent. *See id.* at 770 ("If the excess insurance company is not able to deliver on its contractual promises, the insurance guaranty fund can be called upon if the excess company is a licensed company."); *id.* at 783 ("Licensed excess insurance companies not only are subject to closer regulatory supervision than unlicensed companies, but also provide workers' compensation groups with the additional protection afforded by state insolvency guaranty funds.").

In 1984 the Iowa Department of Insurance adopted regulations pertaining to "workers' compensation groups self-insurance." The regulations specifically provide that such a group formed pursuant to Iowa Code section 87.4 shall not be deemed to be an insurance company, shall not be subject to the provisions of the insurance laws, and shall not be subject to the premium tax on direct insurance under Iowa Code section 432.1. 191 Iowa Admin.Code 56.1(1), 56.-2(4).

The following year the legislature, in an apparent approval of these regulations, amended section 87.4 by exempting self-insured groups from the payment of premium taxes under section 432.1. 1985 Iowa Acts ch. 251, § 1. Thus, it seems clear to us that both the Insurance Department, to whose regulations we give deference, and the Iowa Legislature meant to reinforce the section 515B.2(4) distinction between "insurers" and workers' compensation self-insured groups. In short, the groups are simply not "insurers" for purposes of Iowa Code chapter 515B. The Association's arguments to the contrary lack merit.

Apart from the fact that the Group is not an insurer under the Code, we think there is an additional reason why it is not an insurer. In determining whether an entity is an insurer, we must

"look through the form of the transaction to determine whether the relationship of insurer and insured exists. Whether the contract is one of insurance must be determined from its purpose, effect, content, terminology, and conduct of the parties, and not from its designation therein, since a contract which is fundamentally one of insurance cannot be altered by the use or absence of words in the contract itself. The court must look also to the intention of the parties in making this determination." *Huff v. St. Joseph's Mercy Hosp. of Dubuque Corp.*, 261 N.W.2d 695, 700 (Iowa 1978) (quoting *Appleman on Insurance*).

Applying the above principles to the arrangement between the Group and its members, we think such an arrangement hardly resembles insurance as it is commonly understood. The joint and several liability provision underlying the separate indemnity agreement between the Group and its members materially distinguishes the arrangement from traditional forms of insurance. No traditional insurance policy that we are aware of requires all of the company's insureds to contribute their own funds, without limitation, to satisfy the company's claims in the event of its insolvency.

Notwithstanding the joint and several liability feature, the Association insists the arrangement between the Group and its members is insurance. A contract is one of insurance if it meets the following test: one party, for compensation, assumes the risk of another; the party who assumes the risk agrees to pay a certain sum of money on a specified contingency; and the payment is made to the other party or the party's nominee. *Huff*, 261 N.W.2d at 700.

The Association claims the arrangement between the Group and its members meets the *Huff* test. Focusing on the risk element of the test, the Association argues that the Group assumes the risk because the liability agreement states that the Group, rather than the members, is "directly and primarily liable to any person entitled to benefits payable by this agreement." The Association characterizes the

Group's duty under the agreement as primary and the members' joint and several liability as secondary.

The Group counters by arguing that it did not assume the risks of its members—it merely acted as an agent for all its members to spread their risks of adverse workers' compensation claims among themselves through the joint and several liability provision in the indemnity agreement. The Group looks upon the joint and several liability provision as the prime distinction between an employer's membership in a self-insurance group and an employer's purchase of workers' compensation insurance.

For example, an employer who purchases workers' compensation insurance transfers *all* of its compensation risks to the insurer, who is obligated to pay all claims up to the policy limits. The employer cannot be compelled to contribute toward the payment of an insurer's other claims if the insurer's own resources are not enough to satisfy all its contractual obligations. In contrast, an employer that is a member of a self-insurance group not only retains financial exposure for its own workers' compensation claims but also for the claims against other member employers.

While it is true that the Group does assume some risk, it does not assume *all* of the risks. This is so because of the joint and several liability provision. As explained by one treatise writer,

> [a]ll insurance contracts concern risk transference, but not all contracts concerning risk transference are insurance. The complex bundle of risks from a venture gives rise to a variety of kinds of legal risk transference, some of which are not regarded as insurance for any purpose, and some of which are regarded as insurance for one purpose but not for another. Even in states having the broadest statutory or decisional definitions of insurance, which if literally applied would include all or nearly all contracts transferring risk, many arrangements literally within such definitions

are not treated as insurance transactions in legal contexts.

R.E. Keeton, *Insurance Law* 6 (1971).

According to Keeton, "[j]ust as risk transference may be accomplished without insurance, so may risk distribution." *Id.* at 7. Self-insurance, in Keeton's view, is a form of risk distribution, or in the Group's words, "risk spreading." Though entities operating in this way are sometimes referred to as self-insurers, Keeton takes the position that this type of operation involves *no* insurance as that term is used in regulatory statutes. *Id.* at 7–8; *accord Zinke-Smith*, 304 So.2d at 509.

We agree with Keeton's analysis. Given the legal context of self-insured workers' compensation groups and the degree of risk retained by self-insured group members vis-a-vis the degree of risk transferred by the members, we are led to conclude that the arrangement in question does not make a self-insured group an insurer for purposes of chapter 515B. Risk spreading, the primary function served by the arrangement between the Group and its members, may be accomplished without insurance, just as risk transference may be. Our conclusion is in harmony with the purposes of section 87.4 and chapter 515B. It simply makes no sense to allow employers to take advantage of the provisions of section 87.4 and then deny them the protection of chapter 515B in the event of an insurance carrier's insolvency.

Iowa Code section 515B.2(3) buttresses our conclusion. As we noted, a covered claim does not include the self-insured portion of the claim. By implication then, claims by self-insured entities are covered by our Guaranty Association Act. Significantly, the statute makes no distinction between self-insured portions of claims filed by self-insured employers and those filed by self-insured groups.

■ *B. Underwriting association status.* An underwriting association is not defined in Iowa Code chapter 515B. An underwriter is simply an insurer. Davids, *Dictionary of Insurance* 255. We think the legislature intended the term "underwriting association" as used in section

515B.2(3) to mean a group of insurers. We have already determined that the Group is not an insurer for purposes of chapter 515B. Therefore, it is not an underwriting association either.

The district court correctly concluded that the Group is not an insurer or underwriting association for purposes of section 515B.2(3).

## IV. *Are Claims Filed by Employees of the Group's Members Covered?*

■ The Association challenges the district court's finding that the Mission policy covered workers' compensation claims made by employees of the Group's members. To support its challenge, the Association points to the definition of "employees" in the policy. The policy defines employees to "include any person performing work which renders the [Group] liable under the [Iowa Workers Compensation Act] for bodily injuries or occupational disease sustained by such person." Because section 515B.5(1)(b) provides that the Association shall be liable only to the extent of the insolvent insurance company's liability, the Association argues that only workers employed by the Group itself were covered. Consequently, the argument concludes, Mission, and therefore the Association, would not be liable for workers' compensation claims made by employees of the Group's members.

The policy language, to say the least, is loose. But we, like the district court, find from the evidence that Mission and the Group understood and intended the policy to indemnify the Group for benefits paid to employees of its members. As the district court noted,

> [s]ection 87.4 . . . and [191 Iowa Administrative Code 56.1(2) ] recognized the purpose for the Group's existence was to provide reasonable conditions for self-insurance which would pay workers' compensation benefits due employees of members of an association such as the [Group]. The evidence discloses that the [Group] itself had only one or two employees and these were office workers. It hardly can be contended seriously that

the [Group] paid a premium of $112,000 to cover only one or two office employees.

Because this is an equity case, we apply equitable principles. A single maxim answers the Association's contention: "Equity regards substance and intent, rather than form, to prevent injustice." *Federal Land Bank of Omaha v. Bollin,* 408 N.W. 2d 56, 62 (Iowa 1987). We agree with the district court's analysis and conclusion that the claims by employees of the Group's members were covered by the Mission policy.

## V. *Does the Subrogation Provision of the Mission Policy Inure to the Benefit of the Association?*

■ Finally, the Association contends the district court erred in refusing to require the Group to pursue its indemnification rights against its members pursuant to the Mission policy or, in the alternative, in not permitting the Association to be subrogated to those rights. The Mission policy provision (Section XI) that the Association relies on requires the Group to pursue all claims that it may have against any person or entity as a result of the payment of a loss and to apply any recovery to reduce that loss. In the event the Group fails or neglects to pursue such a claim within a reasonable time, the provision permits Mission to be subrogated to the claim.

Because section 515B.5(1)(b) gives the Association the same rights that the insolvent insurance company has under the policy, the Association argues that this statutory provision entitles it to all of the rights Mission was entitled to assert under Section XI of the policy.

The next step in the Association's argument is premised on 191 Iowa Administrative Code 56.7(5)(b). This regulation requires entities such as the Group to have an indemnity agreement in effect at all times that jointly and severally binds such entities and each employer member to meet the workers' compensation obligations of each member.

Such an indemnity agreement was in force at the time of the losses. Conse-

quently, the Association argues, the Group should be required to do one of two things according to Section XI of the Mission policy: (1) enforce its rights of indemnity under the indemnity agreement against the Group's members for the benefit of the Association, or (2) assign all of its rights under the indemnity agreement to the Association so that the Association can seek indemnity from the Group's members.

Like the district court, we think the Section XI subrogation language was intended to track the provisions of Iowa Code section 85.22, part of the Workers' Compensation Act, rather than to give the Association any rights against the Group's members. Section 85.22 permits a paying party to be subrogated to the injured workers' rights against a third-party tortfeasor responsible for the injuries. Moreover, section 85.20 makes it clear that the employer is not such a third party even though the employer might have caused the injury. We reach this conclusion for two reasons.

First, we agree with the Group that the Association's argument makes no economic sense. It would be unreasonable for the Group to pay $112,000 for a policy that afforded its members no protection.

Second, the only time a self-insured group member may be assessed is when a deficit occurs in any fiscal year. In that event, the assessment is joint and several. 191 Iowa Admin.Code 56.7(5)(b). Here, a deficit is threatened because of Mission's insolvency. As the Group aptly argues in its brief, "To use the Mission insolvency to make the [Group] members liable to the [Association] is to reverse the roles of the parties and stand chapter 515B on its head."

Any other result would, as a practical matter, deny employers the statutory right to pool assets to provide workers' compensation benefits for their employees and the concomitant statutory right to be financially protected when they do so. We decline to interpret section 87.4, the provisions of chapter 515B, and the accompanying administrative regulations to accomplish such an impractical and unreasonable result. *See* Iowa Code §§ 4.6(1), (2), (5).

After all, what is really involved here is a potential threat that would leave injured workers with no recourse. We have long been committed to a broad interpretation of statutory provisions involving workers' compensation benefits, so as to insure that injured workers receive what is justly due them. We should do no less here.

### VI. *Disposition.*

Given the legislative background of section 87.4 and chapter 515 and their interrelationship, we are convinced the legislature intended claims filed by self-insured workers' compensation groups to be covered by the provisions of chapter 515B. In reaching that conclusion, we think the district court correctly concluded that the Mission policy was direct insurance rather than reinsurance and that the Group was not an insurer or underwriting association. Further, we agree with the district court that the Mission policy does cover employees of members of the Group and that the subrogation provisions of the Mission policy do not inure to the Association's benefit. For all of these reasons, we affirm the judgment of the district court.

AFFIRMED.