EEP WORKERS' COMPENSATION FUND, Respondent,

v.

FUN & SUN, INC., Defendant,

Carol A. Wagner n/k/a Carole Hanish, Appellant.

No. A10–913.

Court of Appeals of Minnesota.

Feb. 1, 2011.

Scott J. Hoss, Michael S. Dietz, Dunlap & Seeger, P.A., Rochester, MN, for respondent.

Stephen F. Rufer, Pemberton, Sorlie, Rufer & Kershner, P.L.L.P., Fergus Falls, MN, for appellant.

Considered and decided by SHUMAKER, Presiding Judge; PETERSON, Judge; and MINGE, Judge.

## OPINION

MINGE, Judge.

A business that was a member of a workers' compensation self-insurance group challenges the district court's grant of summary judgment in favor of the group for payments of workers' compensation benefits. The business argues that it is not liable to reimburse the group for benefits paid to an employee after the business withdrew from the group on a claim that was initially approved during its membership in the group. We conclude that the district court did not err by construing the group documents as establishing liability for such payments. But because there are issues of material fact with regard to the defenses of equitable estoppel and breach of contract, we reverse and remand for further consideration of those matters.

## FACTS

In 1997, appellant F & S Concrete Paving, Inc. (F & S) considered switching from traditional commercial workers' compensation insurance to respondent EEP Workers' Compensation Fund (EEP), a self-insurance group fund for contractors. EEP's solicitation materials indicated that EEP was composed of 20 Minnesota construction employers, that it met the employers' statutory obligation for workers' compensation coverage, and that the program was regulated by the Minnesota Department of Commerce. The materials explained that self-insurance allows employers to manage and reduce the risk of employee injuries and claims, and to obtain "a return of the premium not needed to pay claims and administrative costs—a dividend or surplus." The materials stated, "The premium dollar is retained because of the long payout profile," with payout on large losses "spread out over

time." The materials further explained that a third-party administrator managed the fund, providing a variety of services including: assistance with the approval process by the Commissioner of the Minnesota Department of Commerce (commissioner), "placement of specific and aggregate excess insurance," investigations, pursuit of recovery from third parties, and provision of "comprehensive safety services," such as injury prevention, loss control, and risk management services. The program was labeled "GROUP SELF–INSURANCE" and the materials emphasized, "We never lose sight of the fact that it is *your program,* and *your funds!* "

In April 1997, F & S joined the EEP group self-insurance program after the commissioner approved its membership. As a member, F & S agreed to be bound by the Minnesota Workers' Compensation Act, the attendant administrative rules, and EEP's bylaws, and "to be jointly and severally liable for all claims and expenses of all the members of EEP Workers' Compensation Fund *arising in any* fund year in which F & S ... is a member of the group." (Emphasis added.)

F & S was a family business originally operated by the father of Carol Wagner n/k/a Carol Hanish. From 1997, Hanish was the principal shareholder of F & S and, with her late husband, was a director and officer. Her husband managed the business and made the decision that F & S should join EEP. In 2003, after her husband's death, Hanish sold the assets of the operating business but kept the corporate shell with certain assets and liabilities.[1] At that time, F & S withdrew from EEP. This litigation concerns financial liability for workers' compensation benefits paid by

EEP, after that asset sale and withdrawal, to a person who had been an F & S employee, was injured, had submitted an earlier workers' compensation claim, and had first been paid benefits prior to the sale.

F & S paid a premium to EEP every year from 1997 through 2003. The premium increased each year, starting at $8,540 in 1997, with a final full premium of $31,401 in 2002. The premium calculation was based on three factors: (1) F & S's history of claims; (2) F & S's estimated payroll; and (3) a pro rata share of the costs of managing the fund. After a payroll audit at the end of each year, the premium was adjusted for actual hours worked. During its membership in the fund, F & S paid a total of $116,379 in premium payments: $38,560 of this amount went to F & S's share of the fixed costs of managing the fund and $77,819 went to the loss fund. Payments made from this loss fund covered the cost of claims by F & S employees for workers' compensation benefits up until the time F & S left the group, the final audit was performed, and the "final" bill was paid.

By the end of 2007, four years after F & S's withdrawal, EEP had paid an additional $60,486.71 for workers' compensation claims by F & S employees. Most significant for the dispute on appeal is a serious work-related injury of an F & S employee that occurred in 1999. EEP accepted the employee's 1999 claim and paid him benefits from December 1999 through July 2000, while F & S was a member. Additional benefits were paid to him from December 2003 through April 2007, subsequent to F & S withdrawing from EEP.

---

1. Part of the asset sale included the business name F & S Concrete Paving. As a result, the surviving shell corporation changed its name to Fun & Sun, Inc. Because the name change is irrelevant to the issues before this court, we continue to use "F & S."

In August 2005, Hanish and F & S received a letter from EEP stating that F & S had "an individual negative fund balance" attributable to the additional claims arising out of the 1999 employee injury. In March 2008, EEP filed suit against F & S and Hanish, alleging claims of breach of contract, contribution/indemnification, unjust enrichment, and with regard to Hanish, shareholder/director liability based on improper distributions by F & S to her. F & S and Hanish filed an answer, asserting, among other defenses, laches, equitable estoppel, EEP's own breach of contract, and failure to mitigate damages.

In January 2009, EEP moved for summary judgment, submitting documents setting forth the premiums paid by F & S, claims paid by EEP to F & S employees, and the fixed costs of operating the fund. EEP also submitted the indemnity agreement signed by F & S and copies of the two sets of EEP's bylaws that were in effect between 1997 and 2003. F & S and Hanish opposed EEP's motion, submitting an affidavit by Hanish regarding her understanding of the fund, EEP's solicitation materials, and premium invoices. Hanish averred that she was never aware that F & S would be separately responsible for all workers' compensation benefits paid to its employees by EEP, that "[t]here was never any remote suggestion that EEP was somehow different than commercial insurance," and that she had no personal liability.

In June 2009, the district court granted EEP's motion for summary judgment against F & S, awarding EEP the "uncontroverted amount" of $60,487. This amount represented the negative balance still remaining after subtracting F & S's premium payments from its share of fixed costs while it was a member and benefits paid to F & S employees. Specifically, the district court relied on the language of the indemnity agreement and found that appellant's "conceptualization of the issue evinces a misunderstanding of self-insurance liability and indemnification." The district court denied F & S's equitable-estoppel claim on the basis that EEP did not have a duty to inform F & S of outstanding claims upon F & S's withdrawal, and that EEP did not intend for F & S to act on the alleged omission.

In March 2010, the district court granted Hanish's motion to dismiss claims against her on the ground that EEP lacked standing to bring suit against her personally under Minn.Stat. §§ 302A.557, .559 (2008). The district court also denied EEP's motion to amend its complaint to add a claim that Hanish's shell corporation made fraudulent transfers to her on the basis that the motion was untimely. This appeal by F & S followed.[2]

## ISSUES

I. Did the district court err by granting summary judgment for EEP based on the determination that F & S is liable to reimburse EEP for workers' compensation benefits paid to its employees after it withdrew from the fund for an injury that occurred prior to withdrawal?

II. Did the district court err in granting EEP summary judgment dismissal of F & S's defense of equitable estoppel?

III. Does F & S have a meritorious defense of laches to EEP's claims?

---

**2.** We note that the case caption designates Hanish as the appellant in this case. The record before us is not clear regarding any interest that Hanish retained in F & S. Neither party challenges her standing to defend claims against F & S or to bring this appeal on F & S's behalf, nor do we further consider the matter here.

IV. Did the district court err in dismissing F & S's breach-of-contract defense?

## ANALYSIS

### I.

■ The first issue in this appeal is whether the district court erred by determining that F & S is liable to reimburse EEP for benefits paid by EEP on an existing claim by an F & S employee after F & S withdrew from membership. On appeal from summary judgment, this court asks whether there are any genuine issues of material fact and whether the district court erred in its application of the law. *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990). "The construction and effect of a contract are questions of law for the court, but where there is ambiguity and construction depends upon extrinsic evidence and a writing, there is a question of fact for the jury." *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn. 1979). A contract is ambiguous if its language is subject to more than one reasonable interpretation. *Brookfield Trade Ctr., Inc. v. Cnty. of Ramsey*, 584 N.W.2d 390, 394 (Minn.1998).

In Minnesota, every employer is liable to compensate its employees for personal injuries arising out of and in the course of employment without regard to the employees' negligence. Minn.Stat. § 176.021, subd. 1 (2010). To this end, every employer, except the state and its municipal subdivisions, must carry workers' compensation insurance or, in the alternative, obtain permission from the commissioner to self-insure. Minn.Stat. § 176.181, subd. 2(a) (2010).

To self-insure, an employer must "have and maintain sufficient assets, net worth, and liquidity to promptly and completely meet all of its obligations that may arise under [the workers' compensation statutes]." Minn.Stat. § 79A.03, subd. 4 (2010). The statute sets forth requirements for self-insurance and factors the commissioner is to consider in determining whether an employer meets these requirements. *Id.* In addition, two or more employers who may not qualify to self-insure on their own may apply to the commissioner to insure as a commercial self-insurance group. Minn.Stat. § 79A.19, subd. 6 (2010).[3]

Here, the record indicates that EEP is a "commercial self-insurance group" under Minnesota statutes.[4] In order to be licensed as a commercial self-insurance group, the group must submit to the commissioner, among other things, a copy of the group's bylaws and an indemnity agreement from each member. Minn.Stat. § 79A.21, subd. 2 (2010). Forms for an

**3.** The Minnesota Department of Commerce promulgated regulations on workers' compensation self-insurance, found in Minn. R. 2780.2100–.9920 (2009). Because the rules do not provide guidance beyond the statutory provisions with regard to the issue before us, we cite to the statutes.

**4.** A "commercial self-insurance group" is defined as a "group of employers that are self-insured for workers' compensation under chapter 176 and elects to operate under sections 79A.19 to 79A.32...." Minn.Stat. § 79A.19, subd. 6. The record indicates that EEP is a commercial self-insurance group because it is composed of employers in similar industries, managed by a third-party administrator, and has a board of directors composed of employer-members. *See* Minn. Stat. §§ 79A.20, subd. 1 (stating that a commercial self-insurance group consists of two or more employers in similar industries); .22, subd. 1 (requiring commercial self-insurance groups to elect a board of directors composed of members); .22, subd. 8 (2010) (requiring commercial self-insurance groups to secure administrative services through a service company).

indemnity agreement are set forth in a statute and a rule. Minn.Stat. § 79A.27 (2010); Minn. R. 2780.9920. To provide the assurance of financial resources sufficient to cover all anticipated workers' compensation claims, the net worth of all the employer-members must be adequate, the group must establish a common-claims fund, all employer-members must contractually accept joint and several liability for workers' compensation obligations incurred by any member, and the group must purchase reinsurance. *See* Minn. Stat. § 79A.22, subd. 2 (setting forth financial standards for commercial self-insurance groups); .22, subd. 4 (requiring a commercial self-insurance group to establish a common-claims fund); .22, subd. 5 (requiring each employer-member to be jointly and severally liable for the workers' compensation claims of all group members); .22, subd. 10 (2010) (requiring a commercial self-insurance group to purchase reinsurance).

We note that F & S is correct that nothing in the statutes, rules, or EEP bylaws clearly spells out that each employer-member is ultimately liable to reimburse the fund for benefits paid by the fund to its employees, even after it withdraws as a member. We also note that EEP heavily relies on the provisions of the law and EEP documents providing for joint and several liability and indemnification. But, the joint and several liability provisions only establish the larger liability of each employer-member of EEP for "all claims and expenses of all members of [EEP]." *See* Minn.Stat. §§ 79A.21, subd. 2(d), .27. The joint and several liability provisions do not clearly apply to EEP's request for reimbursement for claims and expenses that it has paid and do not spell out the contribution obligation of each employer-member of EEP.

Furthermore, the indemnification agreement signed by F & S only has a series of "whereas" clauses; it fails to include any operative language setting forth its indemnification obligation. The form used by EEP follows the regulatory form set forth in the state rules. Minn. R. 2780.9920. However, there is also a similar indemnification form set forth in Minn.Stat. § 79A.27, which does include language clearly expressing the indemnity obligation.[5] Unfortunately, the two forms do not parallel each other, leading to undue confusion. But the failure to include specific language about the indemnification obligations does not relieve F & S of liability.

While the lack of clarity in the statutes and the slippage in the indemnification agreement is unfortunate, an employer's responsibility for payment on its own employees' claims is the only logical conclusion to be reached based on the statutory provision for self-insurance, the statutory language and scheme for self-insurance groups, and EEP's bylaws. As previously noted, self-insurance is an alternative to conventional workers' compensation insurance for employers that have the financial resources to pay claims themselves. *See generally* 22 Britton D. Weimer et al., *Minnesota Practice* § 13.13 (2d ed.2010). But because the financial requirements of individual self-insurance are so stringent, states allow employers to form self-insurance groups to meet these requirements that otherwise only large employers could meet. *Compare* Minn.Stat. § 79A.03, subd. 4 (providing that an individual self-insurer must have and maintain sufficient assets, net worth, and liquidity, as deter-

---

**5.** Minn.Stat. § 79A.27 states that the group (EEP) "shall assess [F & S] on an individual and proportionate basis for its share of the total liability of the commercial self-insurance group."

mined by the commissioner pursuant to various factors, in order to qualify to self-insure); *with* Minn.Stat. § 79A.03, subd. 6 (2010) (providing for group self-insurance); *and with* Minn.Stat. § 79A.21 (2010) (providing for commercial self-insurance groups). *See also Ala. Ins. Guar. Ass'n v. Ass'n of Gen. Contractors Self–Insurer's Fund*, —— So.3d ——, ——, 2010 WL 4777547, at *13 (Ala. Nov. 24, 2010) (stating that the purpose of a self-insurance group is to allow employers "to qualify as self-insurers under the workers' compensation law . . . in lieu of their having to obtain insurance from an insurance company").

A group self-insurance fund presumably allows for lower premium payments than traditional workers' compensation insurance in exchange for bearing the risk of self-insuring liability and assuming joint, several, and indemnification liability for other members of the group. *See Iowa Contractors Workers' Comp. Grp. v. Iowa Ins. Guar. Ass'n*, 437 N.W.2d 909, 917 (Iowa 1989) ("[A]n employer that is a member of a self-insurance group not only retains financial exposure for its own workers' compensation claims but also for the claims against other member employers.").

Also, we note that the language of the relevant statutes indicates that surpluses and deficits with regard to money paid into the common claims fund and paid out in claims is calculated on the basis of each employer-member of the group. *See* Minn.Stat. § 79A.22, subd. 11(b) (2010) (providing that "surplus money for a fund year . . . may be declared refundable to eligible ·members."). This language indicates that while the group's premium payments are maintained in the common claims fund, any yearly surplus is calculated and distributed on an individual basis.

Next, we note that article IX of the EEP bylaws, which were in effect when F & S became a member of EEP, provides that any fund surplus is calculated by taking members' premiums, reduced by members' share of fixed costs and "their *own* incurred losses for that year." (Emphasis added.) If the remainder is positive, that member may receive a pro rata percentage of the distribution; if the remainder is negative, the member is disqualified from any distribution. Likewise, fund deficits are assessed to members by "subtracting from *each member's* annual premium paid in a fund year, the sum of *each member's* pro rata of premium share of fixed program costs *and incurred losses.*" (Emphasis added.) Thus, the bylaws provide that members receive surplus distributions and are assessed deficits according to their individual performance and standing. There is no countervailing indication that claims paid to employees of an individual member are absorbed by the group.

Last, and perhaps most importantly, article XIII of the bylaws provides:

Any member withdrawing from the fund at a time when that member's share of the fund surplus is in a deficit position (negative) shall pay to the Fund at the time of withdrawal a sum in addition to that member's annual premium equal to the deficit. *Any additional deficit determined after withdrawal to be attributable to the withdrawn member shall be paid to the Fund by the withdrawn member upon demand by the Fund.*

(Emphasis added.) This language establishes that each employer-member is ultimately responsible to reimburse the fund for claims paid by EEP to cover a member's respective deficits. These deficits could only arise from new claims for old injuries to the member's employees or for

a larger failure of the fund due to insolvency.

EEP's method for calculating yearly premiums confirms our conclusion. The yearly premium amount is based on the amount of each employer-member's payroll multiplied by an "experience modification factor." The experience modification factor contemplates the hazardous nature of the particular jobs performed at each employer-member's place of business, as well as the workers' compensation claims made by the employer-member's employees in the past. Where, as here, the workers' compensation claims increase for a particular employer-member, the amount of the yearly premium also increases, so that the premiums paid in by each employer-member will, over time, ultimately pay off the accrued liabilities for losses (benefits paid to employees of that member). If the employer leaves EEP before an employee's claims are finally resolved, future deficits will occur.

■ F & S argues that the indemnity agreement does not make it liable because the claims of its former employee "arose" after F & S had withdrawn as a member, not "in any fund year in which F & S ... [was] a member of the group." This ignores the Article III language discussed above and the common meaning of the word "arose." The underlying claim giving rise to this controversy "arose" in 1999, when the employee was injured and when F & S was a member of the EEP fund. *See Black's Law Dictionary* 122 (9th ed.2009) (defining "arise" as "[t]o orig-

inate"). We further note that allowing an employer-member to withdraw from the fund without remaining liable for its employees' claims is inconsistent with the concept of self-insurance and provides an incentive for employer-members with larger exposure for future benefits to simply leave the fund and escape responsibility. Such a scheme creates a moral hazard that would render group self-insurance programs unworkable.

■ In sum, we conclude that, despite the lack of precise and specific language, based on this record, the statutes, and the overall design and operation of the group, it is clear that, subject to any reinsurance and excess insurance,[6] F & S and each employer-member of EEP is ultimately liable to reimburse EEP for the claims of its employees that arose while F & S was a member and that exceed the claims portion of premiums previously paid in. We further conclude that F & S's withdrawal from EEP prior to future payments made on the 1999 injury does not relieve F & S of that obligation.

## II.

■ The second issue is whether EEP is equitably estopped from recovering reimbursement from F & S for the benefits paid to employees after F & S withdrew from EEP.[7] A party seeking to assert the defense of equitable estoppel must prove three elements: (1) that representations were made; (2) that the party reasonably relied on such representations;

6. References to reinsurance, separate insurance, and excess insurance appear in documents in the record. There is no claim that any such insurance arrangements have any relevance to the issues before us, and we do not consider them.

7. The parties and the district court do not distinguish between the equitable-estoppel claim as it is raised by F & S and by Hanish.

Because claims against Hanish were dismissed by the district court and EEP does not appeal that dismissal, it is not clear that an equitable-estoppel defense by Hanish is relevant in this proceeding. Given our decision to remand this issue, the Hanish/F & S differences in any equitable-estoppel defense can be addressed by the district court on remand.

and (3) that it will be harmed if estoppel is not applied. *Eide v. State Farm Mut. Auto. Ins. Co.,* 492 N.W.2d 549, 556 (Minn. App.1992). A party can claim estoppel only if the other party's conduct led it to change its position. *Cont'l Cas. Co. v. Knowlton,* 305 Minn. 201, 214–15, 232 N.W.2d 789, 797 (1975).

■ Affirmative promises or inducements are not required to establish equitable estoppel; the representations may consist of "silence or a negative omission to act when it was [a party's] duty to speak or act." *Pollard v. Southdale Gardens of Edina Condo. Ass'n, Inc.,* 698 N.W.2d 449, 454 (Minn.App.2005) (emphasis omitted) (quoting *Dimond v. Manheim,* 61 Minn. 178, 182, 63 N.W. 495, 497 (1895)). Furthermore, it is not necessary that the party who made the representations did so with actual fraudulent intent; it is enough that, knowing the truth, the party intentionally made the representations "under such circumstances as show that the party making them intended, or might reasonably have anticipated, that the party to whom they are made ... will rely and act on them as true." *Stevens v. Ludlum,* 46 Minn. 160, 161, 48 N.W. 771, 771 (1891); *see also Alwes v. Hartford Life & Accident Ins. Co.,* 372 N.W.2d 376, 379 (Minn.App. 1985) (providing that "negligence takes the place of intent to deceive, where there is a duty to disclose"). While the question of estoppel is generally for trial, it can be resolved on summary judgment if the evidence is conclusive. *Grant Cnty. State Bank v. Schultz,* 178 Minn. 556, 560, 228 N.W. 150, 152 (Minn.1929).

Here, F & S argues that EEP should be equitably estopped from recovering because its failure to inform F & S or Hanish that the 1999 claim remained open and subject to further payment on subsequent claims at the time of F & S's withdrawal prejudiced F & S. Specifically, F & S

argues that had it known about the open claim, it would have factored the risk into its asset sale or intervened in EEP's investigation and acceptance of subsequent claims.

The record indicates that EEP did not clearly communicate to F & S that F & S had ongoing liability to reimburse EEP for claims paid to its employees or that there were any injured employees whose files were not closed. The annual renewal and invoice documents submitted by F & S show the estimated premium for the upcoming year, subject to the subsequent audit, but fail to indicate the status of F & S's individual fund balance or the existence of open claims. The documents submitted by EEP summarize the premiums paid by F & S and the claims paid to F & S employees according to the date on which the benefits were paid, but they fail to indicate whether EEP apprised F & S of its fund deficit on an ongoing basis. Without this information, there is a factual question whether the representations made by EEP regarding F & S's obligations were misleading and, if so, whether they affected the asset sale or F & S's initiative to seek and obtain insurance coverage for the risk of future or ongoing claims.

■ In granting EEP summary judgment, the district court reasoned that there was no misrepresentations by act or omission giving rise to an equitable-estoppel claim because EEP was not contractually bound to inform F & S of any outstanding claims. "Where estoppel is based on a party's silence, there must be not only silence, but a duty to speak under the circumstances of the case." *Conner v. Caldwell,* 208 Minn. 502, 507, 294 N.W. 650, 653 (1940) (providing that silence does not result in estoppel where a party's right appears as a matter of public record).

Here, the solicitation materials provided to F & S indicate that the claims-management services would include "communications" regarding claims, starting from the date of injury. The materials further provide that the third-party administrator would provide "statistical reports," or "personalized loss data reports that assist in developing a more cost effective and efficient workers' compensation program." And lastly, a document entitled "Advantages of Group Self–Insurance" states, "With self-insurance, the employer has the opportunity to work actively with the claims staff in claims resolution." The record does not indicate that EEP, or the third-party administrator it employed to manage F & S's claims, provided such communications and statistical reports regarding F & S's loss data on an ongoing basis or upon withdrawal from the fund. Further, F & S represents that it did not have any opportunity to work with the third-party administrator to resolve the one large outstanding claim and was not kept advised of the status of that claim upon withdrawing from membership. Thus, there is an issue of material fact regarding the nature and character of the representations made to F & S during its membership in EEP and upon its withdrawal from the fund regarding its individual liability to pay employee claims.

The district court further reasoned that F & S failed to show that EEP "intended that F & S act upon EEP's alleged 'omission' to its detriment." But as discussed above, F & S need not show intent to mislead to establish equitable estoppel. F & S need only show that EEP should have known that it was "natural and probable [it] would rely on those actions." *See Alwes*, 372 N.W.2d at 379. In the context of a duty to disclose, "negligence takes the place of intent to deceive." *Id.* Because the materials regarding the EEP self-insurance group fund are complex and fail to set forth F & S's liability with clarity, and because the record presents a genuine issue of material fact regarding representations made by EEP to F & S throughout F & S's membership and upon its withdrawal, we reverse the district court's summary judgment rejection of the defense of equitable estoppel and remand for further proceedings on that defense.

## III.

F & S also argues that the doctrine of laches prevents EEP from recovering reimbursement from F & S. "The supreme court has consistently held that when an action is governed by a statute of limitations, the doctrine of laches does not apply." *Hebert v. City of Fifty Lakes*, 784 N.W.2d 848, 856–57 (Minn.App.2010) (citing, *inter alia*, *M.A.D. v. P.R.*, 277 N.W.2d 27, 29 (Minn.1979)). EEP's action here was for breach of contract, a cause of action with a six-year statute of limitations. *See* Minn.Stat. § 541.05 (2010). Therefore, laches does not apply and is not a viable defense for F & S.

## IV.

Finally, F & S argues that there are issues of fact as to whether EEP's agents breached their contractual duties under the bylaws in managing the employee's claim that led to the additional charges. F & S challenges whether the claim was properly paid, citing a large gap in time between payments, and argues that EEP had no incentive to investigate knowing that F & S would be ultimately responsible for the payments. The district court found that F & S had not contested the amount of liability or its calculation, and did not directly address this claim. However, in questioning whether EEP properly investigated and paid the claims, F & S

is challenging the amount of liability for which it is responsible. While we conclude that F & S is liable for workers' compensation benefits paid to its employees, F & S also has the right to a proper accounting of those payments. In this context, F & S may be able to establish losses due to improper handling of this worker's compensation claim. We remand this issue to be considered in addition to the equitable estoppel defense.[8]

## DECISION

We conclude that the district court did not err in determining that F & S is liable to reimburse EEP for payments made on employees' open workers' compensation claims after F & S withdrew from the fund. But because there is a genuine issue of material fact regarding EEP's dealings with F & S, we reverse and remand to the district court for further proceedings on the equitable-estoppel defense and breach-of-contract issues.

**Affirmed in part, reversed in part, and remanded.**

**8.** F & S also challenges whether EEP set aside an appropriate reserve amount on this claim. As we have found that F & S is liable for the payments, the amount of reserve set aside by EEP is not at issue.