MURDOCK, Justice.
The Alabama Insurance Guaranty Association (“the AIGA”) appeals from a summary judgment entered by the Montgomery Circuit Court against the AIGA and in favor of the Association of General Contractors Self-Insurer’s Fund (“the AGCSF”).[1] The issue on appeal is whether the AGCSF may recover from the AIGA based upon a claim arising out of an insurance policy (“the Reliance policy”) issued by Reliance National Indemnity Company (“Reliance”). We hold that it may, and we affirm.

I. Facts and Procedural History

A. General

The AGCSF is a group of employers who, through their participation in *190 AGCSF, have qualified as “self-insurers” under Ala.Code 1975, § 25-5-9(a), a part of the Workers’ Compensation Act, Ala. Code 1975, § 25-5-1 et seq. Section 25-5-9(a) states:
“The Director of Industrial Relations may, under such rules and regulations as he may prescribe, permit two or more employers, as such term is defined in Section 25-5-1, to enter into agreements to pool their liabilities under this chapter for the purpose of qualifying as self-insurers under this chapter. Each employer member of such approved group shall be authorized to operate as a self-insurer under this chapter.”
The AIGA is “a nonprofit unincorporated legal entity,” Ala.Code 1975, § 27-42-6, created pursuant to the Alabama Insurance Guaranty Association Act, Ala.Code 1975, § 27-42-1 et seq. (“the Guaranty Act”). The legislature enacted the Guaranty Act and created the AIGA
“to provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payments and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies and to provide an association to assess the cost of such protection among insurers.”
Ala.Code 1975, § 27-42-2.
As it existed at the time the claim arose in the present case, the Guaranty Act defined a “covered claim” as
“[a]n unpaid claim, including one of unearned premiums, which arises out of, and is within the coverage and not in excess of, the applicable limits of an insurance policy to which this chapter applies, issued by an insurer, if such insurer becomes an insolvent insurer after January 1, 1981, and (i) the claimant or insured is a resident of this state at the time of the insured event; or (ii) the property from which the claim arises is permanently located in this state. ‘Covered claim’ shall not include any amount due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise.” [2]
Ala.Code 1975, § 27-42-5(4) (emphasis added). Section 27-42-3, Ala.Code 1975, states that the Guaranty Act “shall apply to all kinds of direct insurance, except life, annuities, disability, accident and health, title, surety, credit, mortgage guaranty and ocean marine insurance.” The parties’ dispute primarily concerns (1) whether the AGCSF’s claim under the Reliance policy and against the AIGA concerns an amount due an “insurer” or an “insurance pool,” as those terms are used in § 27-42-5(4), and (2) whether the Reliance policy is one for direct insurance, i.e., an “insurance policy to which [the Guaranty Act] applies.”
Based upon an affidavit from Joseph S. Ammons, chief counsel for the Workers’ Compensation Division of the Alabama Department of Industrial Relations, “[sjince January 1, 1982, [the AGCSF] has been recognized by the State of Alabama as a group of employers that have pooled their *191 resources together to meet their liabilities to injured employees for the purpose of qualifying as self-insurers pursuant to the [Workers’ Compensation Act].”[3]
Also, according to an affidavit from Don Jones, the administrator of the AGCSF,
“[i]f an employer wants to join [the AGCSF], it and [the AGCSF] must enter into a participation agreement. Pursuant to this participation agreement, an employer is assessed contributions for its membership in [the AGCSF], The members’ contributions are placed in a fund and are available for the payment of workers compensation claims made by the injured employees of [the AGCSFJs members. According to the participation agreement which each member enters into, each member remains jointly and severally liable for any payments above the sum of the members contributions. Each member retains the financial risk of loss for those claims filed by the member’s employees and also for the claims filed by the employees of the other members of [the AGCSF].”
(References to exhibits omitted and emphasis added.) See Ala. Admin. Code (Department of Industrial Relations), r. 480-5-3-.06 et seq. (regulatory requirements for self-insured-employer groups). It does not appear that the participation agreement between the AGCSF and the member at issue in the present case, M & D Power Construction Co. (“M & D Power”), was included in the parties’ submissions to the trial court.
The explanation of how the AGCSF operates provided by Jones’s affidavit is consistent with the amended and restated bylaws of the AGCSF (“the bylaws”). The bylaws require the AGCSF to establish a “claims-fund account” to hold members’ contributions and from which to pay workers’ compensation claims. The bylaws further state:
“The [AGCSF] and its members shall be jointly and severally liable to assume and discharge, by payment, any claim due to be paid by the [AGCSF], any settlement approved by the [AGCSF,] and any judgment under the Alabama Workers’ Compensation Act against the [AGCSF] or any of its members.”
According to an affidavit from David Parsons, the deputy commissioner for the Alabama Department of Insurance, so far as the Department of Insurance is concerned, “[s]elf-insured workers’ compensation groups are not ‘insurers’ under the laws pertaining to insurance in the State of Alabama and these groups are not regulated by the Alabama Department of Insurance.” See Ala.Code 1975, § 27-1-2(2) (defining an “insurer” as “[e]very person engaged as indemnitor, surety or contractor in the business of entering into contracts of insurance ” (emphasis added)) and § 27-1-2(1) (defining “insurance” as “[a] contract whereby one undertakes to indemnify another or pay or provide a specified amount or benefit upon determinable contingencies”). Consistent with Parsons’s affidavit, the bylaws state that the AGCSF “is not an insurance company and does not sell insurance.” Of course, such a *192 statement is not determinative of whether the law deems the AGCSF to be an insurer or to issue insurance contracts. See Schoepflin v. Tender Loving Care Corp., 631 So.2d 909, 912 (Ala.1993) (“ ‘[A] company may be found to be engaged in an insurance business even though it expressly disclaims any intention to sell insurance.’ ” (quoting 43 Am.Jur.2d Insurance § 4 (1982))).[4]
In 1987, several § 25-5-9(a) self-insured-employer groups, including the AGCSF, established the Alabama Reinsurance Trust Fund (“the Reinsurance Trust Fund”) pursuant to Ala.Code 1975, § 25-5 — 9(b). Section 25-5-9(b) provides that “[t]wo or more employer groups as described in [§ 25-5-9](a) ... may enter into agreements to pool their liabilities under this chapter for the purpose of providing excess coverage above the self-insured retention levels maintained by the individual employer groups.” (Emphasis added.) See generally Black’s Law Dictionary 1391 (8th ed.2004) (defining “self-insured retention” as “[t]he amount of an otherwise-covered loss that is not covered by an insurance policy and that usu[ally] must be paid before the insurer will pay benefits”).
The trust indenture for the Reinsurance Trust Fund provides for the trustees of that fund to issue an instrument referred to as a “Policy” to each participating self-insured-employer group. The trust indenture defines “Policy” as “[a] schedule which is issued by the Trustees to a [self-insured-employer group] and which sets forth the rights with respect to excess coverage and the responsibilities (including, without limitation, premium commitments) of such [self-insured-employer group].” The record does not contain a copy of the “policy” the Reinsurance Trust Fund issued to the AGCSF, and the specific terms of the policy are not discussed in any of the pleadings, motions, or briefs included in the record on appeal.
Section 4.01 of the trust indenture for the Reinsurance Trust Fund states that
“[e]ach [self-insured-employer group] shall make all contributions, or premium payments, to the Trust Fund required by the Policy issued to it within the time required by said Policy. Each [self-insured-employer group] shall also make timely payment to the Trust Fund of such assessment or assessments as may be made by the Trustees from time to time in accordance with the terms of the By-Laws.”
Also, § 2.01 of the trust indenture states:
“The Trust is intended to serve as a vehicle for the pooling of the liabilities of the [self-insured-employer groups] under the Alabama Workmen’s Compensation Act so as to provide the [self-insured-employer groups] with excess coverage above their respective self insured retention levels, and in furtherance of such purpose, the Trust shall (i) serve as a repository for operation and administration of amounts paid to the Trust by the [self-insured-employer groups] in accordance with the provisions of their respective Policies and the terms hereof and of claims made by the [self-insured-employer groups] pursuant to their respective Policies and the terms hereof; ... (iii) provide for the payment of all of the liabilities, debts and obligations contingent or otherwise in respect of the Trust Fund; ... (vi) provide for the distribution to [self-insured-employer groups] of their respective interests in all distributable proper *193 ty comprising the Trust Fund and of any amounts payable under the Policies; and (vii) hold a portion of the property comprising the Trust Fund for such additional claims or liabilities as the Trustees may determine.”
(Emphasis added.) Further, the trust indenture authorizes the trustees to “obtain appropriate insurance, or reinsurance, from such insurance carrier or carriers as the Trustees may from time to time deem appropriate.” (Emphasis added.)
According to an affidavit from Boyd Kelly, the administrator of the Reinsurance Trust Fund,
“[i]n 1998, the [Reinsurance Trust Fund], acting as a broker for its members [i.e., the various self-insured-employer groups], sought to secure an insurance policy for its members with Reliance National Indemnity Company for the purpose of providing ‘excess coverage above the self insured retention levels maintained by each member. ’ ... Each of the member funds reimbursed the [Reinsurance Trust Fund] for premium paid that was attributable to each fund based on that fund’s limits of coverage and its retention amount.... The Reliance policy agreed to reimburse each [Reinsurance Trust Fund] member[ ] when its losses had exceeded an amount called the retention level up to a specific amount which varied according to the member self-insured fund.”
(Emphasis added.)
A document titled “Certificate Of Reinsurance” issued in relation to the Reliance policy states, at the outset: “IN CONSIDERATION OF THE PAYMENT OF THE REINSURANCE PREMIUM AND SUBJECT TO THE TERMS AND CONDITIONS CONTAINED HEREIN, WHICH ARE MADE PART OF THIS CERTIFICATE, RELIANCE NATIONAL INDEMNITY COMPANY (HEREAFTER CALLED THE REINSURER) DOES HEREBY REINSURE” the Reinsurance Trust Fund. (Capitalization in original.) The certificate continues:
“COVERAGE: To indemnify [the Reinsurance Trust Fund] for loss paid or payable as a result of:
“(A) compensation and other benefit payments required of the Reassured [5] by the Workers Compensation Law of any state;
“and
“(B) Sums that [the Reinsurance Trust Fund] shall become legally obligated to pay as damages because of bodily injury by accident or disease, including death at any time resulting therefrom, sustained in the United States of America, its territories or possessions, or Canada.”
Further, the certificate states that the Reinsurance Trust Fund would “retain for its own account or for that of its treaty rein-surer, if applicable,” “0% OF WORKERS’ COMPENSATION” and “0% OF EMPLOYER’S LIABILITY.” (Capitalization in original.)
The certificate reflects a separate liability limit for each of the self-insured-employer groups that participated in the Reinsurance Trust Fund. As to the liability limit for claims in relation to the AGCSF, Reliance “agree[d] to indemnify the [Reinsurance Trust Fund]” for:
“A. WORKERS COMPENSATION— 100% OF $1,000,000 EACH ACCIDENT AND EACH EMPLOYESS [sic] AS RESPECTS OCCUPATIONAL DISEASE EXCESS OF A $400,0000 *194 [sic] S.I.R.[6] EACH ACCIDENT AND EACH EMPLOYESS [sic] AS RESPECTS OCCUPATIONAL DISEASE. “B. EMPLOYERS LIABILITY— 100% OF $1,000,000 EACH ACCIDENT AND EACH EMPLOYESS [sic] AS RESPECTS OCCUPATIONAL DISEASE EXCESS OF A $400,0000 [sic] S.I.R. EACH ACCIDENT AND EACH EMPLOYESS [sic] AS RESPECTS OCCUPATIONAL DISEASE.”
(Capitalization in original.) The “General Conditions” included in the certificate state:
“1. The Reinsurer agrees to indemnify [the Reinsurance Trust Fund] against losses or damages which [the Reinsurance Trust Fund] is legally obligated to pay with respect to which insurance is afforded during the term of this Certificate under this policy reinsured, subject to the reinsurance limits and coverage shown in the Declarations. The Reinsurer shall not Indemnify the [Reinsurance Trust Fund] for liability beyond circumscribed policy provisions, including but not limited to punitive exemplary, consequential or compensatory damages resulting from an action of an insured or assignee against the Company.... Nothing contained herein shall in any manner create any obligation of the Reinsurer or [establish any rights against the Reinsurer in favor of the direct insured or any third parties or any persons not parties to this Certificate of Reinsurance.[7]
“2. [The Reinsurance Trust Fund] shall settle all claims under its policy in accordance with the terms and conditions thereof. If the Reinsurance hereunder is pro rata, the Reinsurer shall be liable for its pro rata proportion of settlements made by the [the Reinsurance Trust Fund]. If the reinsurance hereunder is excess, the Reinsurer shall be liable for its excess proportion of settlements made by the [the Reinsurance Trust Fund] after deduction of any recoveries from pro rata reinsurance inuring to the benefit of the Reinsurer.[8]
[[Image here]]
“8. The reinsurance provided by this Certificate shall be payable by the Rein-surer directly to [the Reinsurance Trust Fund] ... on the basis of the liability of [the Reinsurance Trust Fund] under the policy reinsured without diminution be *195 cause of the insolvency of [the Reinsurance Trust Fund].”
It appears from the materials in the record before us that, at all times pertinent to the present case, Reliance, which was apparently a Pennsylvania company, was authorized to do business in the State of Alabama. In May 2001, Reliance was placed into rehabilitation in Pennsylvania because it was allegedly insolvent. In October 2001, a Pennsylvania court declared Reliance insolvent and ordered it liquidated.

B. The Claim at Issue

In May 1999, Paul David Wheeler allegedly suffered an on-the-job injury in Alabama while employed by M & D Power, which is a member of the AGCSF. Wheeler, a resident of Florida when he was injured, filed a workers’ compensation claim against M & D Power. Eventually, the AGCSF’s payments for Wheeler’s workers’ compensation claim exceeded $400,000. The AGCSF notified the Reinsurance Trust Fund that it had been required to make payments in excess of its self-insured retention.[9] In May 2002, Kelly, as administrator of the Reinsurance Trust Fund and on behalf of AGCSF, filed a claim with Reliance, and, in light of Reliance’s insolvency, with the AIGA.
In June 2004, after realizing that Wheeler was a resident of Florida when he was injured and that he still resided in Florida, the AIGA sent the claim file to the Florida Workers’ Compensation Insurance Guaranty Association (“the FWCIGA”),[10] along with a letter that stated, in part:
“This insured claims that they have exceeded their $400,000.00 Self Insured Retention on this claim. There is a question regarding coverage as there appears to be an issue of Reinsurance? The insured will continue this claimant’s weekly temporary total disability benefits through and including July 4, 2004. Your contact with the insured is Don Jones[, the administrator of the AGCSF].... Mr. Jones asked that he be contacted immediately to discuss who will be handling this claim file for the [FWCIGA][;] he needs to notify the previous handlers so that they may contact the claimant to advise him of what has taken place with his file.
“... Also, [enclosed] is a folder that Mr. Jones provided with Certificates of Reinsurance for the years of 1999 and 2000. I spoke with Reliance’s Ken Parker today and he asked that you contact him regarding coverage issues.”
Although the letter elsewhere refers to M & D Power as the insured in regard to Wheeler’s claim, the foregoing language clearly is referring to the AGCSF as the “insured which had exceeded its $400,000 self-insured retention.”
In a letter dated June 21, 2004, to the AGCSF, the FWCIGA rejected its claim, stating:
“After completing a review of the claim file, I contacted Mr. Kenneth Parker of Reliance National, via email. Mr. Parker informed me that the insured, Alabama Reinsurance Trust Fund, was assumed reinsurance. As a result of *196 this information, I proceeded to discuss the claim further with our Director of Claims, Bob Groves. After my discussions with Mr. Groves, it is our position that we will be unable to provide coverage for this claim under our statute ([Fla. Stat. § ] 631.904), as it specifically excludes reinsurance.” [11]
Neither the AIGA, which had forwarded the claim to the FWCIGA, nor the Reinsurance Trust Fund nor the AGCSF filed a judicial proceeding to contest the FWCI-GA’s denial of the claim.[12] Instead, the AGCSF requested that the AIGA pay the claim. In a letter dated July 2, 2004, counsel for the AGCSF informed counsel for the AIGA as follows:
“As we discussed in our conversation last month, my client, [the AGCSF,] has filed a claim with [the AIGA]. It is my understanding that [the AIGA] has determined that [the AGCSF]’s claim does not fall within the definition of ‘covered claim.’ This letter is intended to explain [the AGCSF]’s position regarding this coverage question.”
The letter continued by discussing the AGCSF’s position that the Reliance policy was “direct insurance,” not reinsurance, and that it was covered under the provisions of the Guaranty Act. The AGCSF contended that neither it nor the Reinsurance Trust Fund could be considered “insurers” under the exclusion language found in § 27-43-5(4).
After it did not receive an acceptable response from the AIGA, the AGCSF sued the AIGA in the Montgomery Circuit Court. The AGCSF alleged that the AIGA had refused to pay a “covered claim” under the Guaranty Act. It requested that the trial court enter a judg *197 ment declaring the “rights, duties, and liabilities of the parties” under the Reliance policy and that it award the AGCSF “a judgment for the amounts owed to [the AGCSF] in this matter with interests and costs.” The AIGA filed an answer denying that the AGCSF’s claim was a “covered claim” under the Guaranty Act.
The AGCSF filed a motion for a summary judgment, evidentiary materials in support of its motion, and a brief in support thereof, including the affidavits quoted above. The AGCSF asserted that
“[t]he dispute between the parties in this case appears to be whether Reliance’s insurance policy constituted ‘direct insurance’ and therefore, a covered claim, or ‘reinsurance.’ Although this precise issue has never been addressed by the courts of this state, this issue has been addressed and decided by the Iowa Supreme Court in a factually similar case, Iowa Contractors Workers’ Compensation Group v. Iowa Insurance Guaranty Association, 437 N.W.2d 909 ([Iowa] 1989).”
The AGCSF then went on to discuss the rationale and holding in Iowa Contractors Workers’ Compensation Group v. Iowa Insurance Guaranty Ass’n, 437 N.W.2d 909 (Iowa 1989), see discussion infra, and cases from other jurisdictions that allegedly supported its argument that the AIGA was obligated to pay the AGCSF’s claim.
The AIGA opposed the AGCSF’s summary-judgment motion, and it filed a “cross-motion” for a summary judgment. The AIGA argued that “[i]t was not designed as a safety net for self-insurers like [the AGCSF].” Specifically, the AIGA asserted:
“First, [the AGCSF] has failed to exhaust its claim against [the FWCIGA] pursuant to AIa.Code § 27-42-12(b), which requires that it first look to the [FWCIGA] relative to this workers’ compensation claim. Second, the subject certificate of reinsurance is not direct insurance and does not fall within the ambit of the protections afforded under the [Guaranty] Act. See Ala.Code § 27-42-3 (1975); [Alabama Ins. Guar. Ass’n] v. Pierce, 551 So.2d 310, 312-13 (Ala.1989). Finally, even if the certificate of reinsurance qualified as direct insurance, the [Guaranty] Act excludes from its protections amounts due an ‘insurance pool’ or ‘insurer’ such as the [Reinsurance Trust] Fund/[the AGCSF]. Ala.Code § 27-42-5(4).”
In part, the materials the AIGA filed in support of its cross-motion included an affidavit from Joseph C. Manus, assistant vice president for Reliance, which stated, in part, that “Reliance intended for [the Reliance policy] to be a reinsurance policy and does not consider it to be a policy that provides excess workers’ compensation coverage.” The AIGA also filed a motion to strike a portion of Kelly’s affidavit. The AIGA argued that Kelly’s statement that “[t]he Reliance policy agreed to reimburse each [Reinsurance Trust Fund] member[ ] when its losses had exceeded an amount called the retention level up to a specific amount which varied according to the member self-insured fund” was
“inconsistent with the Certificate of Reinsurance which clearly shows that the reinsurer agrees to indemnify the [Reinsurance Trust Fund] rather than the particular member of the [Reinsurance Trust Fund]. In other words, the Certificate of Reinsurance agrees to reimburse the [Reinsurance Trust Fund] rather than its particular members.”
But see discussion, infra, concerning the parties’ subsequent stipulation that Reliance had issued the Reliance policy “to the three members of the [Reinsurance Trust] Fund,” one of whom is the AGCSF, and that the policy “provide[d] for reimburse *198 ment to the individual members of the [Reinsurance Trust] Fund.”[13] The AIGA asserted that the insurance policy at issue was the best evidence of its content.
The AGCSF filed a motion to strike Manus’s affidavit because, it said, the affidavit did not reflect the factual basis behind his assertions, particularly whether he was employed by Reliance when it issued the Reliance policy or what involvement he had had in the negotiations concerning the Reliance policy. The AGCSF also filed a response in opposition to the AIGA’s cross-motion for a summary judgment.
In November 2006 the trial court entered an order granting the AGCSF’s motion for a summary judgment and denying the AIGA’s motion. The order states, in part:
“There are only a few issues that must be resolved in this case. First, in its cross-motion for summary judgment, AIGA states that this Court should not entertain this action because AGC[SF] has failed to exhaust its remedies, pursuant to § 27-42-12, Code of Alabama 1975, with the [FWCIGA], This argument is without merit. The exhaustion of remedies doctrine applies to ‘administrative remedies.’ Talton Communications, Corp. v. Coleman, 665 So.2d 914, 919 (Ala.1995). From the evidence before this Court, it is undisputed that AGC[SF] did pursue and exhaust its administrative remedies with [the FWCIGA] because it submitted a claim with the [the FWCIGA] and that claim was denied by [the FWCIGA], Although AIGA argues to this Court that AGC[SF] should have pursued a lawsuit against [the FWCIGA] before filing its claim against AIGA, this Court finds that such a lawsuit would have been frivolous and one of the exceptions to the doctrine of exhaustion of remedies is where such action would be futile. Gadsden v. Entrekin, 387 So.2d 829, 833 (Ala.1980). A ‘covered claim’ under both the Florida and Alabama statutes does not include ‘any amount due any reinsurer, insurer, insurance pool, or underwriting association.’ However, the difference between Florida’s and Alabama’s statutes is that Florida’s statute specifically defines an ‘insurer’ as ‘an *199 insurance carrier or self-insurance fund,’ [Fla. Stat. Ann.] § 631.904(5), and Alabama’s statute does not define the term ‘insurer’ but its definition of ‘member insurer’ does not include a self-insurance fund. AGC[SF] has done all it had to do to seek recovery from the [FWCIGA] and thus, has satisfied the requirements of § 27-42-12.
“Second, the real dispute between the parties appears to be whether the Reliance policy constitutes ‘direct insurance’ because it is an excess workers compensation policy, or ‘reinsurance.’ In support of its motion for summary judgment, AGC[SF] has submitted the affidavit of Boyd Kelly, the administrator of the [Reinsurance Trust Fund]. Kelly stated in his affidavit that ‘In 1998, the [Reinsurance Trust Fund], acting as a broker for its members, sought to secure an insurance policy for its members with Reliance National Indemnity Company for the purpose of providing “excess coverage above the self insured retention levels maintained by each member.” ’ In response, AIGA submitted the affidavit of Joseph C. Manus, an Assistant Vice-President for Reliance. In his affidavit, Manus stated that Reliance intended that the policy at issue in this case was reinsurance and not excess insurance. Although Mr. Manus states in his affidavit that he has personal knowledge of the matters contained in his affidavit, he does not state what role he played, if any, at the time this policy was issued. In contrast, Mr. Kelly does relate his intimate knowledge of the events surrounding the securing of the Reliance policy. Although, the policy itself uses the term ‘reinsurance, ’ this Court must interpret a policy of insurance according to its substance and not its form. Baker v. Eufaula Concrete Co., 557 So.2d 1228 (Ala.1990); Lavender v. Ball, 267 Ala. 104, 100 So.2d 331 (1958); Moncrief v. Donohoe, 892 So.2d 379 (Ala.Civ.App.2003); Birmingham News Co., Inc. v. Chamblee, 617 So.2d 689 (Ala.Civ.App.1993). ‘[I]t is settled that the nature of a contract is to be determined by the terms and conditions of the contract itself and not by the name given to it. It is not a question of what the parties call a contract, but what they put in the contract, because the law regards substance and not form.’ McGuire v. Andre, 259 Ala. 109, 115, 65 So.2d 185, 190 (1953).”
(Emphasis added.) The trial court then discussed the Iowa Supreme Court’s decision in Iowa Contractors, concluding that the Reliance policy was not a reinsurance policy. The trial court concluded that neither the Reinsurance Trust Fund nor the AGCSF were insurers and, accordingly, that the AGCSF’s claim was a covered claim under the Guaranty Act. It directed the AIGA to “pay all claims submitted by AGC[SF] pursuant to the Reliance policy at issue in this case.” The trial court did not specify the amount of damages due the AGCSF from the AIGA, however.
The AIGA appealed, and this Court remanded the case to the trial court for a determination as to damages and for the entry of a final judgment. On remand, the parties stipulated that the AGCSF had made workers’ compensation benefit payments to or on behalf of Wheeler in the amount of $907,734.96, that the AGCSF was responsible for paying $400,000 of that amount as self-insured retention, and that the terms of the Reliance policy required Reliance to reimburse the AGCSF for the remaining $507,73L96.[14] They further *200 stipulated that Reliance had issued the Reliance policy “to the three members of the [Reinsurance Trust] Fund,” one of whom is the AGCSF, and that the policy “provide[d] for reimbursement to the individual members of the [Reinsurance Trust] Fund for ‘loss paid or payable as a result of: ... Compensation and other benefit payments required of the Reassured [Insured] by the Workers Compensation Law of any state ..Nonetheless, the AIGA maintained its position that AGCSF’s claim was not a “covered claim” under the Guaranty Act.
After conducting a hearing on remand and considering the parties’ stipulations, the trial court entered a judgment against the AIGA and in favor of the AGCSF in the amount of $507,734.96. The court directed the AIGA to pay all future claims submitted by the AGCSF concerning Wheeler, “up to the $1,000,000 limit of the Reliance policy of insurance.”

II. Standard of Review

The standard of review for a ruling on a motion for a summary judgment is well settled:
“ ‘A summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. The burden is on the moving party to make a prima facie showing that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. In determining whether the movant has carried that burden, the court is to view the evidence in a light most favorable to the nonmoving party and to draw all reasonable inferences in favor of that party. To defeat a properly supported summary judgment motion, the nonmoving party must present “substantial evidence” creating a genuine issue of material fact — “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” Ala.Code 1975, § 12-21-12; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).’
“Capital Alliance Ins. Co. v. Thorough-Clean, Inc., 639 So.2d 1349, 1350 (Ala.1994). Questions of law are reviewed de novo.”
Pritchett v. ICN Med. Alliance, Inc., 938 So.2d 933, 935 (Ala.2006).
The AIGA does not contend that the summary judgment was improper because there was a material issue of fact. Based on the arguments made by the AIGA, we are presented only with the question whether the trial court erred as to the law or as to the application of the law to the undisputed material facts.

III. Analysis

The AIGA argues that the trial court erred when it concluded that the AGCSF had no further obligation to pursue its claim with the FWCIGA. The AIGA also argues that the trial court erred when it concluded that the claim at issue was a “covered claim” under the Guaranty Act because, according to the AIGA, the AGCSF and the Reinsurance Trust Fund are “insurers” or “insurance pools,” and the Reliance policy was reinsurance, not direct insurance.[15]

*201
A. Exhaustion of Remedies

The AIGA contends that the trial court failed to properly apply Ala.Code 1975, § 27-42-12(b), when it concluded that the AGCSF had no further obligation to pursue its claim with the FWCIGA. Section 27-42-12(b) provides:
“(b) Any person having a claim which may be recovered under more than one insurance guaranty association or its equivalent shall seek recovery first,from the association of the place of residence of the insured except that if it is a first party claim for damage to property with a permanent location, he shall seek recovery first from the association of the location of the property and if it is a workmen’s compensation claim, he shall seek recovery first from the association of the residence of the claimant. Any recovery under this chapter shall be reduced by the amount of recovery from any other insurance guaranty association or its equivalent.”
(Emphasis added.)[16]
The AIGA contends that if the AGCSF’s position on the merits is correct (i.e., that its claim is a “covered claim” under the Guaranty Act), then the FWCIGA would be required to pay the claim because the Guaranty Act and the act governing the FWCIGA are “in material respects similar.” [17] The AIGA further contends that the last sentence of § 27-42-12(b) means that the AGCSF can seek recovery from the AIGA “[o]nly if there are insufficient benefits available from [the FWCIGA].”
We need not address whether the Guaranty Act and the pertinent statutory provisions governing the FWCIGA are “in material respects similar,” though that does not appear to have been the case when the present claim arose. See note 11, supra. Whether the statutes are or are not “in material respects similar,” the plain language of § 27-42-12(b) does not support the AIGA’s position.
As this Court stated in DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 275-76 (Ala.1998):
“In determining the meaning of a statute, this Court looks to the plain meaning of the words as "written by the legislature. As we have said:
“ ‘ “Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, *202 and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.” ’
“Blue Cross & Blue Shield v. Nielsen, 714 So.2d 293, 296 (Ala.1998) (quoting IMED Corp. v. Systems Eng’g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992)).... It is true that when looking at a statute we might sometimes think that the ramifications of the words are inefficient or unusual. However, it is our job to say what the law is, not to say what it should be. Therefore, only if there is no rational way to interpret the words as stated will we look beyond those words to determine legislative intent. To apply a different policy would turn this Court into a legislative body, and doing that, of course, would be utterly inconsistent with the doctrine of separation of powers.”
(Emphasis added.)
Assuming § 27-42-12(b) is applicable in the present case, it required the AGCSF to first “seek recovery ... from the association of the residence of the claimant,” i.e., the FWCIGA. There is no dispute that the AGCSF sought recovery from the FWCIGA and that the FWCIGA denied the AGCSF’s claim based on the application of Florida law. The AIGA did not contend to the trial court, and it does not argue to this Court, that the FWCIGA wrongly understood or wrongly applied Florida law when it concluded that the Reliance policy was a reinsurance policy. Thus, it does not appear that the claim is one “which may be recovered under more than one insurance guaranty association,” and § 27-42-12(b) is thus inapplicable.[18]
Also nothing in § 27-^12 — 12(b) suggests that the legislature intended to require, as a precondition to pursuing a claim against the AIGA, that a party seek further relief (by filing a case in court, for example) if the “other guaranty association” denied the claim.[19] Indeed; the imposition of such a requirement would be inconsistent with one of the purposes of the Guaranty Act, namely “to avoid excessive delay in payments.” Ala.Code 1975, § 27-42-2. In short, based on the arguments presented and the facts before us, it appears that the AGCSF satisfied any obligation it had under § 27-42-12(b).
B. Is the AGCSF or the Reinsurance Trust Fund an Insurer or an Insurance Pool?
Section 27-42-5(4) of the Guaranty Act defines “covered claim” so as to exclude “any amount due any ... insurer [or] insurance pool ... as subrogation recoveries or otherwise.” The AIGA argues that both the AGCSF and the Reinsurance Trust Fund are “insurers” or “insurance pools,” whose claims are excluded from coverage under the Guaranty Act. We note, however, that the AIGA does not attempt to define the term “insurance pool”; it cites no legal authority in support of a specific argument relating to an “in *203 surance pool”;[20] and its arguments in regard to that term consist only of concluso-ry statements. “We have unequivocally stated that it is not the function of this Court to do a party’s legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument.” Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251 (Ala.1994). Thus, we will not consider whether the AGCSF or the Reinsurance Trust Fund might be an “insurance pool.” Instead, we will confine our analysis to whether the entities at issue are “insurers” as that term is used in the Guaranty Act. We conclude that they are not.
The Guaranty Act does not define the term “insurer.” The Guaranty Act is included within Title 27, however, and § 27-1-2, Ala.Code 1975, states:
“For the purposes of this title, the following terms shall have the meanings respectively ascribed to them by this section.
[[Image here]]
“(2) INSURER. Every person engaged as indemnitor, surety or contractor in the business of entering into contracts of insurance.”
(Emphasis added.) See also Ala. Code 1975, § 27-1-2(8) (defining “person” as “[a]n individual, insurer, company, association, organization, ... partnership, syndicate, business trust, corporation, and every legal entity”). Section 27-1-2(1), Ala.Code 1975, defines “insurance” as “[a] contract whereby one undertakes to indemnify another or pay or provide a specified amount or benefit upon determinable contingencies.”
The broadly worded definition of “insurance” and the use of the above-emphasized restrictive language in the definition of “insurer” compel us to conclude that not all persons who enter into an “insurance” contract, i.e., who “undertake to indemnify another or provide a specified amount or benefit upon determinable contingencies,” are considered “insurers” for purposes of Title 27. In other words, not all persons who contract to insure another person’s obligation are “in the business of entering into contracts of insurance” for purposes of § 27-1-2(2). See Coates v. MS Dealer Serv. Corp., 747 So.2d 341 (Ala.Civ.App.1999) (recognizing that a contract might be considered insurance for purposes of the tort of bad faith without the defendant’s being subject to the provisions of Title 27). In fact, it appears that the legislature has recognized as much in regard to the type of entities involved in the present case. Section 27-4A-2(6), Ala.Code 1975, which defines “insurer” for purposes of the chapter on the Insurance Premium Tax, states that “self-insurance programs utilizing a trust fund or similar entity providing workers’ compensation, health, and other insurance-like coverage shall not be included within this definition of insurer.” (Emphasis added.) Compare Fla. Stat. § 624.4621(7) (providing that “[pjremiums, contributions, and assessments received by *204 a group self-insurer’s fund” under Florida’s workers’ compensation statutes are subject to the premium tax applicable to insurance companies, but the “tax rate shall be 1.6 percent of the gross amount of such premiums, contributions, and assessments”).
Also, enforcement of Title 27, of which the Guaranty Act is a part, falls to the Department of Insurance. See Ala.Code 1975, § 27-2-7. As noted in David Parsons’s affidavit, the Department of Insurance does not consider “[sjelf-insured workers’ compensation groups [to be] ‘insurers’ under the laws pertaining to insurance in the State of Alabama and these groups are not regulated by the Alabama Department of Insurance.”
“[I]t is well established that in interpreting a statute, a court accepts an administrative interpretation of the statute by the agency charged with its administration, if the interpretation is reasonable .... Absent a compelling reason not to do so, a court will give great weight to an agency’s interpretations of a statute and will consider them persuasive.”
Ex parte State Dep’t of Revenue, 683 So.2d 980, 983 (Ala.1996); see also, e.g., Hulcher v. Taunton, 388 So.2d 1203, 1206 (Ala.1980).
Under the circumstances presented, the Department of Insurance’s interpretation that a self-insured-employer group is not an “insurer” within the meaning provided in Title 27 is a reasonable one. It certainly is not unreasonable to conclude that a group formed for the purpose of allowing its members to qualify as self-insurers under the workers’ compensation law (in lieu of their having to obtain insurance from an insurance company regulated by the Department of Insurance) and that is subject to regulation by the Department of Industrial Relations, is not “in the business of entering into contracts of insurance.” As this Court has recognized, self-insurance really is not insurance at all; it is “the antithesis of insurance as that term is commonly used.” Universal Underwriters Ins. Co. v. Marriott Homes, Inc., 286 Ala. 231, 232, 238 So.2d 730, 732 (1970).[21]
Furthermore, the conclusion that groups like the AGCSF and the Reinsurance Trust Fund are not “insurers” is consistent with the position of the framers of the *205 model act upon which the Guaranty Act is based. As this Court has noted, the Guaranty Act “was modeled after the Post-Assessment Property and Liability Guaranty Model Act,” Air Tuskegee, Ltd., 883 So.2d at 195, which was promulgated by the National Association of Insurance Commissioners (“the NAIC”). As the Connecticut Supreme Court observed in Doucette v. Pomes, 247 Conn. 442, 461-62, 724 A.2d 481, 491-92 (1999), a case involving the issue whether a self-insured employer was an “insurer” for purposes of Connecticut’s insurance-guaranty-association act,
“[i]n 1983, an NAIC study committee submitted a report to the NAIC concerning self-insured workers’ compensation groups. 2 NAIC Proceedings (1983) p. 742. While such groups are not identical to an individual [self-insured] employer ..., they do self-insure, as a group. We therefore find the report instructive. The report states in two different places that if a self-insured workers’ compensation group’s excess insurance carrier becomes insolvent, the group should be able to turn to the state’s insurance guaranty association fund, for protection. See 2 NAIC Proceedings, supra, p. 770 (‘[i]f the excess insurance company is not able to deliver on its contractual promises, the insurance guaranty fund can be called upon if the excess company is a licensed company’); id., p. 783 (‘[licensed excess insurance companies not only are subject to closer regulatory supervision than unlicensed companies, but also provide workers’ compensation groups with the additional protection afforded by state insolvency funds’). Therefore, the NAIC report demonstrates the intent of the NAIC that self-insurers are not insurers for purposes of state guaranty acts.”
(Emphasis added; footnote omitted.) Accord Iowa Contractors, 437 N.W.2d at 916 (relying, in part, on the NAIC study committee, which “unequivocally noted the availability of insurance guaranty association fund protection if a [self-insured] group’s excess carrier were to become insolvent,” and concluding that such “groups are simply not ‘insurers’ for purposes of Iowa” law). See also, e.g., MGM Mirage v. Nevada Ins. Guar. Ass’n, 209 P.3d 766, 772 (Nev.2009) (interpreting the Nevada insurance-guaranty-association act: “[B]e-cause the plain meaning of ‘insurer’ necessarily denotes a person or entity that is in the insurance business, self-insured employers are not insurers.... This conclusion is supported by a majority of jurisdictions’ interpretations of their guaranty acts and is in harmony with Nevada’s workers’ compensation laws.”); Stamp v. Department of Labor & Indus., 122 Wash.2d 536, 543-44, 859 P.2d 597, 601 (1993) (“In keeping with a majority of jurisdictions which have considered the status of self-insurers under an insurance guaranty act, we hold that employers which self-insure their workers’ compensation obligations in Washington are not reinsurers, insurers, insurance pools or underwriting associations for purposes of either the Oregon guaranty act, or its nearly identical Washington counterpart.”).[22]
*206 Even if the Department of Insurance had taken no position on this matter, however, we note that in Schoepflin v. Tender Loving Care Corp., supra, this Court stated:
“ ‘Whether a corporation or association is engaged in the insurance business must be determined by the particular objects which it has in view, and not by abstract declarations of general purposes; the business which the organization is actually carrying on, rather than the mere form of the organization, is the test for determining whether it is carrying on an insurance business.’ ”
631 So.2d at 911 (quoting 43 Am.Jur.2d Insurance § 4 (1982) (emphasis added)). After considering the purpose of the AGCSF and the Reinsurance Trust Fund, and “the particular objects which [they have] in view,” we are compelled to conclude that neither is an insurer for purposes of Title 27, including the Guaranty Act.
First, the sole purpose of the AGCSF is to facilitate self-insurance by a select group of employers who meet the requirements set forth in the bylaws.[23] As noted above, self-insurance is the antithesis of insurance. See Marriott Homes, Inc., 286 Ala. at 232, 238 So.2d at 732.
Second, this Court has no basis upon which to decide that a self-insured-employer group might be considered an insurer for purposes of a part of Title 27, namely the Guaranty Act, but not for purposes of the remainder of Title 27. Such a group either is in the “business of entering into contracts of insurance,” § 27-1-2(2), within the meaning of Title 27 and is thus required to meet the requirements of Title 27 governing casualty insurers, or it is not. See Ala.Code 1975, § 27-3-l(a) (“No person shall act as an insurer and no insurer shall transact insurance in this state unless so authorized by a subsisting certificate of authority issued to it by the commissioner, except as to such transactions as are expressly otherwise provided for in this title [ie., Title 27]”.); Ala.Code 1975, § 27-5-6(a)(3) (explaining that workers’ compensation insurance is a type of “casualty insurance”).
*207 Further, in deciding whether a self-insured-employer group might be an insurer governed by Title 27, we cannot ignore the specific statutory scheme in the Workers’ Compensation Act concerning such groups. Crawford v. Springle, 631 So.2d 880, 882 (Ala.1998) (“Where statutes in pari mate-ria are general and specific, the more specific statute controls the more general statute.”). As explained hereinafter, it is clear that to accept the AIGA’s argument would turn the workers’ compensation insurance scheme on its head so far as self-insured employers are concerned.
Section 25-5-8(a), Ala.Code 1975, provides that an employer who is subject to the Alabama Workers’ Compensation Act may
“secure the payment of compensation under this chapter by insuring and keeping insured his or her liability in some insurance corporation, association, organization, insurance association, corporation, or association formed of employers and workers or formed by a group of employers to insure the risks under this chapter, operating by mutual assessment or other plans or otherwise. Notwithstanding the foregoing, the insurance association, organization, or corporation shall have first had its contract and plan of business approved in writing by the Commissioner of the Department of Insurance of Alabama and have been authorized by the Department of Insurance to transact the business of workers’ compensation insurance in this state and under the plan.”
Section 25-5-8(b), Ala.Code 1975, provides that an employer may
“elect[ ] not to insure his or her liability ... [and] furnish satisfactory proof to the director [of the Department of Industrial Relations] of his or her financial ability to pay directly compensation in the amount and manner and when due as provided by this chapter. Upon receiving satisfactory proof, the director shall authorize the employer to operate as a self-insurer. The director may prescribe other reasonable rules and regulations for the purpose of protecting the injured employee or the employee’s dependents and set reasonable fees to accompany self-insurance applications.”
With respect to an employer who chooses to self-insure, § 25-5-9(a) provides that
“[t]he Director of Industrial Relations may, under such rules and regulations as he may prescribe, permit two or more employers ... to enter into agreements to pool their liabilities under this chapter for the purpose of qualifying as self-insurers under this chapter. Each employer member of such approved group shall be authorized to operate as a self-insurer under this chapter.”
(Emphasis added.) The AGCSF is such an approved group. Section 25-5-9(b) provides that
“[t]wo or more employer groups as described in (a) above may enter into agreements to pool their liabilities under this chapter for the purpose of providing excess coverage above the self-insured retention levels maintained by the individual employer groups.”
The Reinsurance Trust Fund constitutes such a group.
The foregoing provisions clearly contemplate that, if an employer chooses to purchase insurance to cover its liability under the Workers Compensation Act, rather than self-insuring that liability, the “insurance” it will purchase for that purpose will be insurance provided by an insurer regulated by the Department of Insurance. See Ala.Code 1975, § 27-3-l(a). As to self-insured employers, however, it is equally clear that such employers and the groups contemplated by § 25-5-9(a) and *208 (b) in order to enable employers to self-insure are regulated by the Department of Industrial Relations, see § 25 — 5—8(b), not the Department of Insurance.[24]
Based on the foregoing, we conclude that the AGCSF and the Reinsurance Trust Fund[25] are not “insurers” for purposes of the Guaranty Act.

C. Is the Reliance Policy a Reinsurance Policy?

The AIGA next argues that the AGCSF’s claim is not a “covered claim” under the Guaranty Act because, according to the AIGA, the Reliance policy is not direct insurance, but is instead reinsurance. Specifically, the AIGA contends that the Reliance policy does not satisfy the definition of direct insurance as set forth in Alabama Insurance Guaranty Ass’n v. Pierce, 551 So.2d 310 (Ala.1989), and that by its terms it is instead reinsurance. We reject the AIGA’s arguments.
We first observe that, for essentially the same reasons we conclude above that the AGCSF and the Reinsurance Trust Fund are not “insurers,” we cannot conclude that the participation agreement issued by the AGCSF or the “policy” issued by the Reinsurance Trust Fund (to the extent the policy otherwise resembles insurance) properly could be classified as “insurance” under Title 27. See also Ala.Code 1975, § 27-4A-2 (describing such “self-insurance programs” as “insurance-like”).
Second, as mentioned above, in Doucette the Connecticut Supreme Court noted that the framers of the model act on which the Guaranty Act was based indicated that a self-insured group
“should be able to turn to the state’s insurance guaranty association fund for protection. See 2 NAIC Proceedings, supra, p. 770 (‘[i]f the excess insurance company is not able to deliver on its contractual promises, the insurance guaranty fund can be called upon if the excess company is a licensed company’)-, id., p. 783 (‘[licensed excess insurance companies not only are subject to closer regulatory supervision than unlicensed companies, but also provide workers’ compensation groups with the additional protection afforded by state insolvency funds ’).”
247 Conn. at 462, 724 A.2d at 492 (emphasis added); see also Iowa Contractors, supra.
Third, the determination whether an insurance policy is reinsurance does not depend solely on whether there is an underlying insurance policy that is being insured. Instead, the determination whether an insurance policy is reinsurance also depends on whether the insured is itself an insurer. Reinsurance is “insurance for insurance companies.” 1A Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 9:1 (3d ed.2005); see also Black’s Law Dictionary 1312 (8th ed.2004) (defining “reinsurance” as “[(Insurance of all or part *209 of one insurer’s risk by a second insurer, who accepts the risk in exchange for a percentage of the original premium”).
“There are two parties to a reinsurance agreement.... The insurance company which is transferring or ‘ceding1 its risk is known as the reinsured, the ‘cedent’ the original insurer, or the direct insurer. The insurance company to which the risk is being transferred is known as the reinsurer. The only non-insurance company that has any relationship to this factual situation is the person or entity that acquires the original insurance contract from the original insurer, and this party is therefore known as the original insured.”
Couch on Insurance at § 9:2 (footnote omitted; emphasis added).
Although the obligations of the AGCSF and the Reinsurance Trust Fund are “insurance like,” and thus the relationship between them and Reliance might resemble reinsurance in some respects, the AGCSF and the Reinsurance Trust Fund are not insurers under Alabama law. Accordingly, by definition, the Reliance policy could not properly be classified as reinsurance for purposes of the Guaranty Act.[26]
*210 Fourth, the AIGA wrongly reads Pierce as requiring the conclusion that insurance that is not paid to Wheeler or to M & D Power is not direct insurance. In Pierce, O.B. Pierce suffered an on-the-job injury while working for his son, Johnny Pierce, who was a vendor of the Tennessee River Pulp & Paper Company.
“Tennessee River’s worker’s compensation insurance was based on an agreement between Western Preferred Casualty Company (“Western’), American Excess Underwriters, Inc., (“American Excess’), and Early American Insurance Company (“Early American’). American Excess issued an insurance policy that named as insured the ‘vendors of Tennessee River Pulp & Paper Company’.... The insurance policy named Western as the insurer of Tennessee River’s vendors. Additionally, the policy contained this attached endorsement by Early American:
“ ‘EARLY AMERICAN INSURANCE COMPANY hereby agrees that in the event the WESTERN PREFERRED CASUALTY COMPANY fails to pay any loss which is payable under this policy, EARLY AMERICAN INSURANCE COMPANY shall become liable for the loss after receiving written notice and demand for payment from the insured. Any payment shall be subject to the terms and conditions of this policy.’
[[Image here]]
“After O.B. Pierce filed his action, he received an affidavit that stated that Western had been placed in receivership. American Excess nevertheless retained counsel to defend Johnny Pierce and it paid O.B. Pierce compensation benefits. Both American Excess and Early American were subsequently placed in receivership. After O.B. Pierce added the [Alabama Insurance] Guaranty Association as a party, the Guaranty Association learned that Western was not licensed to transact insurance business in Alabama and claimed that it had no responsibility either to make compensation payments to O.B. Pierce or to defend and indemnify Johnny Pierce.”
551 So.2d at 311.
This Court first held that the AIGA had no obligation to pay any claim against either Western Preferred Casualty Company or American Excess Underwriters, Inc., because neither of them had been licensed to transact insurance in Alabama. We reached the contrary conclusion as to Early American Insurance Company, however, and went on to consider whether its endorsement was direct insurance under the Guaranty Act:
“Neither the legislature nor this Court has defined ‘direct insurance’ as that term is used in this context. In making our determination of the meaning of ‘direct insurance,’ as that term is used in the Act, we must determine what the legislature intended the words to mean. Alabama Farm Bureau Mutual Casualty Insurance Co. v. City of Hartselle, 460 So.2d 1219, 1223 (Ala.1984). The intention of the legislature must be determined primarily from the language of the statute itself if it is *211 unambiguous, and the words used in the statute must be given their natural, plain, ordinary, and commonly understood meaning. Id. In determining the definition of the term ‘direct insurance’ in the Florida Insurance Guaranty Act, a Florida appeals court, confronted with a situation similar to that presented here, where there was little guidance as to the definition of the term, wrote the following about the plain, ordinary meaning of the word ‘direct,’ as it was used in the Florida act:
“ ‘All agree that the legislature intended the act to have no applicability to insurance which was not “direct insurance.” However, nowhere in the Act, or in Florida Statutes generally, is the term “direct insurance” defined. Nor does it appear that “direct insurance” is a term of art in insurance law generally. The simple word “direct” when used as an adjective is readily and commonly understood to mean immediate; without deviation or interruption; by the shortest route; without circuitry; without any intervening medium, agency or influence.... ’
“Zinke-Smith, Inc. v. Florida Insurance Guaranty Association, 304 So.2d 507, 509 (Fla.Dist.Ct.App.1974). Considering those commonly understood meanings of the word direct as described by the Florida appeals court, we hold that ‘direct insurance’ as used in the Act refers to an insurance contract between an insured and an insurer that has accepted a designated risk of a designated loss to the insured. In the present case, Early American, which was licensed to transact insurance business in Alabama, agreed that, if Western failed to pay any loss payable under the policy, then Early American would be liable to pay for such a loss. Early American, thus, by virtue of an insurance contract, accepted the designated risk that if Western failed to pay Pierce, then Early American would pay Pierce the amount due under that policy (that amount would be the designated loss, of course). Accordingly, the endorsement Early American made as a licensed insurer in Alabama constitutes ‘direct insurance’ within the meaning of the Alabama Insurance Guaranty Association Act, and the Guaranty Association is bound to provide coverage under the provisions of the Act.”
551 So.2d at 312-13 (emphasis added).
Among other things,[27] the AIGA argues that the Reliance policy does not constitute “direct insurance” because it provides indemnity coverage to the Reinsurance Trust Fund rather than coverage to the “direct insured or any third parties.” Although the AIGA made the foregoing argument in its initial appellate brief, on remand it stipulated that Reliance had issued the Reliance policy “to the three members of the [Reinsurance Trust] Fund,” one of whom is the AGCSF, and that the policy “provide[d] for reimbursement to the individual members of the [Reinsurance Trust] Fund for ‘loss paid or payable as a result of: (A) Compensation and other benefit payments required of the Reassured [Insured] by the Workers Compensation Law of any state ... ’.” Thus, we will consider those facts as settled between the parties.
That said, the AIGA misreads Pierce. It is true that in Pierce the insurance was considered “direct insurance” because the *212 proceeds of the policy were paid directly to the injured employee. It is also true that, in Pierce, if Western had been the party to directly pay the injured employee and Early American Insurance Company had merely indemnified Western, the policy under which that indemnification had been made would have constituted a policy of reinsurance. This would have been true in Pierce, however, because Western was an insurer. Here, in contrast, although Reliance did not make a payment directly to Wheeler, the entity to which it was obligated to make payment, AGCSF, was not an insurer. That obligation, therefore, is not an obligation under a reinsurance policy.
Furthermore, in Zinke-Smith, Inc. v. Florida Insurance Guaranty Ass’n, 304 So.2d 507 (Fla.Dist.Ct.App.1974), the primary case upon which Pierce relied, a Florida appeals court noted that “ ‘direct insurance’ as used in the [Florida Insurance Guaranty] Act refers to an insurance contract between the insured and the insurer which has accepted the risk of a designated loss to such insured, which relationship is direct and uninterrupted by the presence of another insurer.” 304 So.2d at 508 (emphasis added). As the Zinke-Smith court further recognized, even “a policy of reinsurance would, of course, be direct insurance as between the parties thereto, i.e., the insurer-reinsured on the one hand and the reinsurer on the other hand.” 304 So.2d at 509 (emphasis added). The court then explained that, “as concerns the scope of the Act, the same was not intended to apply to reinsurance,” because reinsurance was insurance for insurers, who were precluded from recovery under the pertinent provisions of Florida law. Id. As noted, however, the AGCSF is not an insurer. Accordingly, the Reliance policy was one of direct insurance only, not reinsurance.
Given the parties’ stipulations, we conclude that the Reliance policy directly insured the AGCSF as to its risk of loss for the payment of workers’ compensation claims in excess of $400,000. The AGCSF is not an insurer, and the Reliance policy was not a policy of reinsurance.[28]
Based on the foregoing, the judgment of the trial court is affirmed.
1060495 — AFFIRMED.
1071194 — AFFIRMED.
COBB, C.J., and STUART and BOLIN, JJ., concur.
LYONS, J., concurs in part and concurs in the result.

. Although we use the name the parties used for AGCSF, the bylaws of the organization indicate that the name of the entity is the "Alabama Associated General Contractors Self-Insured Workers’ Compensation Fund.”

. While this case was pending, the Alabama Legislature amended § 27-42-5. As part of the amendment, subdivision (4) was redesig-nated as subdivision (6) and the definition of “covered claim” was amended to add to the list of claims that are excluded from the definition of a "covered claim” claims for amounts "due any ... self-insurer.” Act No. 2009-716, Ala. Acts 2009. Also, "self-insurer” is now defined as "[a] person that covers its liability through a qualified individual or group self-insurance program or any other formal program created for the specific purpose of covering liabilities typically covered by insurance.” Ala.Code 1975, § 27-42-5(14).

. Generally self-insured employers must be “members of the [Alabama Workmen’s Compensation Self-Insurers Guaranty Association] as a condition of their authority to self-insure.” Ala.Code 1975, § 25-5-251. The purpose of the Alabama Workmen’s Compensation Self-Insurers Guaranty Association is "to create and fund an insolvency fund to assure payment of worker’s compensation claims due from self-insuring employers who are members of the association and who become insolvent.” Ala.Code 1975, § 25-5-251. The present case does not concern a self-insuring employer who has become insolvent.

. By the same token, we note that the bylaws further provide that the trustees of the AGCSF may "[c]ontract for reinsurance,” and the bylaws authorize the trustees to pay from the claims-fund account any "reinsurance costs.”

5. The term "Reassured” is not defined in the certificate of reinsurance.

6. ‘'S.I.R.” is an acronym for "self-insured retention.”

7. Although the last quoted sentence from paragraph 1 of the General Conditions might be interpreted to mean that the AGCSF had no right to pursue a direct action against Reliance, as hereinafter discussed, the parties have stipulated that the Reliance policy
"provides for reimbursement to the individual members of the [Reinsurance Trust] Fund for ‘loss paid or payable as a result of: (A) Compensation and other benefit payments required of the Reassured [Insured] by the Workers Compensation Law of any state;... ’. Under [the Reliance policy], [the AGCSF] has a $400,000 self insured retention.”
See generally United States Fire Ins. Co. v. Smith, 231 Ala. 169, 175, 164 So. 70, 75 (1935) (noting that normally the reinsured’s policyholders are not in privity with the rein-surer and thus cannot maintain an action on the reinsurance contract but recognizing that " ‘if the contract of reinsurance is made directly for the benefit of reinsured’s policy holders, or if the reinsurer assumes and agrees to perform reinsured’s contracts, the reinsurer becomes directly liable to the policy holder.’ ” (quoting 33 Corpus Juris § 735 (emphasis omitted))).

8. "Excess reinsurance” has been defined as ”[r]einsurance in which a reinsurer assumes liability only for an amount of insurance that exceeds a specified sum.” Black's Law Dictionary 1312 (8th ed.2004).

. The materials contained in the record on appeal do not provide detailed information concerning Wheeler’s claim against M & D Power or the AGCSF’s handling of that claim, nor does the record provide details concerning the AGCSF’s correspondence with the Reinsurance Trust Fund.

. See Ala.Code 1975, § 27-42-12(b) (“Any person having a claim which may be recovered under more than one insurance guaranty association or its equivalent shall[,] ... if it is a workmen’s compensation claim, ... seek recovery first from the association of the residence of the claimant.”). This section is discussed in more detail infra.

. Section 631.904 does not specifically refer to reinsurance or "assumed reinsurance.” Cf. Fla. Stat. § 626.7492(g) (" 'Reinsurance intermediary manager’ means any person who has authority to bind, or manages all or part of, the assumed reinsurance business of a reinsurer....”); Fla. Stat. § 626.7492(h) (" ’Reinsurer' means any person duly licensed in this state pursuant to the applicable provisions of the Florida Insurance Code as an insurer with the authority to assume reinsurance.”).
The FWCIGA apparently concluded that under Florida law the Reinsurance Trust Fund was an insurer, that under the Reliance policy Reliance had assumed the Reinsurance Trust Fund’s obligations to the AGCSF, and that the Reliance policy was therefore assumed reinsurance. See Fla. Stat. § 631.904(2)(defining "covered claim” so as to exclude "any amount due any ... insurer ... as subrogation recoveries or otherwise”); Fla. Stat. § 631.904(5)(defining "insurer” as "an insurance carrier or self-insurance fund authorized to insure under chapter 440,” i.e., the Florida Workers' Compensation Law, Fla. Stat. § 440.01 et seq.); Fla. Stat. § 631.904(6)(de-fining "self-insurance fund” to include a group self-insurance fund authorized under Fla. Stat. § 624.4621); Fla. Stat. § 624.4621(1) (authorizing the Florida Insurance Commission to "adopt rules that allow two or more employers to enter into agreements to pool their liabilities under [the Florida Workers’ Compensation Law] for the purpose of qualifying as a group self-insurer's fund”). The AIGA has not argued that the FWCIGA wrongly applied Florida law, rather than Alabama law, when it rejected the AGCSF’s claim, nor has the AIGA argued that the FWCIGA wrongly interpreted Florida law as to the claim.
As hereinafter discussed, unlike the statutes governing the FWCIGA, the Guaranty Act does not expressly include a self-insurance fund within the definition of the term "insurer.” As noted, a recent amendment to the definition of "covered claim,” however, has added a payment "due any ... self-insurer” to the list of claims excluded from coverage under the Guaranty Act and has further defined "self-insurer” so as to include a "group self-insurance program.” Ala.Code 1975, § 27-42-5(6). See note 2, supra.

. There is no indication from the materials in the record that further administrative review was available to the AGCSF, and the AIGA makes no argument that such was the case.

. Neither party has raised any issue concerning the absence of the Reinsurance Trust Fund as a party to this case. Although we recognize that we can raise the absence of a necessary party ex mero motu, see Chicago Title Insurance Co. v. American Guarantee & Liability Insurance Co., 892 So.2d 369, 371 (Ala.2004), and that the Reinsurance Trust Fund could conceivably have an interest in this matter such that it should be made a party pursuant to Rule 19(a), Ala. R. Civ. P., see Liberty National Life Insurance Co. v. University of Alabama Health Services Foundation, P.C., 881 So.2d 1013, 1021-23 (Ala.2003), we cannot conclude from the record on appeal that the Reinsurance Trust Fund has such an interest. As noted above, the "policy” the Reinsurance Trust Fund issued to the AGCSF is not included in the record on appeal, and its terms are not discussed in any of the materials that the parties filed with the trial court. Without that "policy,” we cannot conclude (1) that the Reinsurance Trust Fund has an obligation to the AGCSF that might "as a practical matter [be] impaired] or impede[d]” by a declaration concerning the AIGA’s obligations under the Reliance policy, if any, or (2) that the AGCSF or the AIGA might be at "substantial risk of ... incurring inconsistent obligations by reason of” any interest of the Reinsurance Trust Fund in this matter. Rule 19(a), Ala. R. Civ. P. It is possible, for example, that the "policy” the Reinsurance Trust Fund issued to the AGCSF limited the rights of the AGCSF to those rights available under any policy of insurance the Reinsurance Trust Fund purchased (i.e., that the "policy” issued by the Reinsurance Trust Fund was in the nature of a nonre-course obligation so far as it was concerned, with Reliance essentially assuming the obligations the Reinsurance Trust Fund otherwise would have had).

. They also stipulated that the Reliance policy had a payout limit of $1,000,000 and that $492,265.04 remained available under the Reliance policy as "potential future coverage" *200 for the AGCSF’s obligations arising out of Wheeler’s claim.

. In addition to excluding amounts due an insurer or an insurance pool, § 27-42-5(4) also excludes amounts due a reinsurer. The AIGA did not argue to the trial court, and it does not argue to this Court, that the AGCSF or the Reinsurance Trust Fund are reinsurers.

. The trial court and the FWCIGA treated the AGCSF’s claim as a "workmen’s compensation claim” as to which recovery first must be sought from the guaranty association of the state of Wheeler's residence, namely Florida. The FWCIGA rejected the claim because it concluded that the Reliance policy was a reinsurance policy under Florida law, and the trial court concluded that the AGCSF had satisfied its obligation to seek recovery first from the FWCIGA. Because the evidence before the trial court supports the conclusion that the AGCSF satisfied any obligation it might have had under § 27-42-12(b), we need not consider whether the trial court’s judgment might be affirmed on the alternative ground that the AGCSF's claim was not a "workmen’s compensation claim” under § 27-42-12(b).

. The Guaranty Act "was modeled after the Post-Assessment Property and Liability Guaranty Model Act.” Alabama Ins. Guar. Ass'n v. Air Tuskegee, Ltd., 883 So.2d 192, 195 (Ala.2003). As the AIGA notes, many states based their statutory schemes concerning the insolvency of certain insurers on the model act, which reflected an attempt at a unified national approach to the issue. See id. at 197; see also American Employers' Ins. Co. v. Elf Atochem North America, Inc., 157 N.J. 580, 597-98, 725 A.2d 1093, 1102 (1999). The FWCIGA Act, Fla. Stat. § 631.901 et seq., which has been amended repeatedly, though similar in some respects to the Guaranty Act, appears to be more limited in scope than the Guaranty Act. Also, the AIGA cites no authority to support the conclusion that the FWCIGA Act is based on the Post-Assessment Property and Liability Guaranty Model Act.

. Of course, the FWCIGA's determination, which was based on Florida law, is not conclusive of the issue whether the Reliance policy is a reinsurance policy for purposes of Alabama law or whether such a policy can form the basis for a claim under the Guaranty Act.

. The AIGA has presented no argument that the AGCSF did not exercise good faith in deciding how far to pursue its claim against the FWCIGA or as to whether a failure to exercise good faith in the pursuit of a claim might impact the application of § 27-42-12(b).

. In a supplemental submission of authority, the AIGA refers this Court to Louisiana Safety Ass'n of Timbermen Self-Insurers Fund v. Louisiana Insurance Guaranty Ass’n, 17 So.3d 350 (La.2009), in support of its argument that the AGCSF and the Reinsurance Trust Fund are insurers. Although not discussed by the AIGA, Louisiana Safety Association states the following in regard to whether a self-insured-employer group is an insurance pool:
"In the present case we are not presented with an insurance pool. Rather than a pooling of insurance, we have a trade or professional association that has agreed to pool their liabilities to their employees on account of personal injury and occupational disease arising out of or incurred during the course and scope of the employment relationship."
Id. at 355 n. 4.

. We also have recognized, however, that
''[s]elf-insurance ... typically involves a single-party, noncontractual situation whereas insurance involves a multi-party, contractual relationship. See Ala.Code 1975, § 27-1-2 (insurance is '[a] contract whereby one undertakes to indemnify another or pay or provide a specified amount or benefit upon determinable contingencies'). Additionally, self-insurance differs materially from insurance in that the former involves no shift in the risk of loss whereas the latter clearly involves such a shift.”
Strength v. Alabama Dep’t of Fin., 622 So.2d 1283, 1288 (Ala.1993).
A member of the AGCSF clearly is not an insurer as to its own employees’ workers' compensation claims. Technically speaking, however, the contractual obligations of the AGCSF and its members might be considered to be insurance, broadly speaking, since the payment of members' assessments to the AGCSF and the maintenance of the claims-fund account for the payment of workers’ compensation claims spread the risk of claims among the members rather than any single member having to bear all the responsibility for its employees’ claims. Thus, it would not be illogical to conclude that the AGCSF, and perhaps its members, might be considered to be engaged in the “business of entering into contracts of insurance” based on the nature of their recurring obligations to one another. The fact that a conclusion other than that reached by the Department of Insurance might also be a reasonable one, however, does not allow us to ignore the Department’s position.

. The recent amendment to the Guaranty Act, which added “self insurer’’ to the list of entities whose claims were excluded from coverage, further supports the conclusion that the term “insurer” did not include, and does not include, a "self insurer.” See note 2, supra. (Of course, a “self-insurer” may be an entity that, on its own, is able to meet the financial and other regulatory requirements to qualify as such or an entity that must combine with others in order to do so. Ala. Code 1975, § 25-5-9(a).)
Also, though we agree with those courts that have concluded that, absent a specific *206 statutory provision to the contrary, a self-insured employer or self-insured-employer group is not an "insurer” for purposes of an insurance-guaranty-association act, we recognize that some courts have reached the opposite conclusion. For example, in Maryland Motor Truck Ass’n Workers’ Compensation Self-Insurance Group v. Property & Casualty Insurance Guaranty Corp., 386 Md. 88, 99, 871 A.2d 590, 596 (2005), the Court of Appeals of Maryland concluded that such a group was an "insurer” based, in part, on the fact that Maryland workers’ compensation "self-insurance groups are subject to extensive regulation by the Insurance Commissioner.” See also Louisiana Safety Ass’n of Timbermen Self-Insurers Fund v. Louisiana Ins. Guar. Ass’n, 17 So.3d at 356-57 (self-insurers and insurers regulated by the Department of Insurance). As discussed above, however, in Alabama such groups are regulated by the Department of Industrial Relations, and the Department of Insurance does not consider them to be "insurers.” Likewise, we find unpersuasive the rationale of the court in South Carolina Property & Casualty Insurance Guaranty Ass’n v. Carolinas Roofing & Sheet Metal Contractors Self-Insurance Fund, 315 S.C. 555, 446 S.E.2d 422 (1994), which based its decision on an arguably more expansive definition of "insurer.” 315 S.C. at 558, 446 S.E.2d at 424 (an "insurer” includes an " 'association ... engaging or proposing or attempting to engage as principals in any kind of insurance ... business.' ” (quoting S.C.Code Ann. § 38-1-20(25) (Supp.1993)) (emphasis added)).

. The bylaws state that "[e]ach member of the [AGCSF] is required to be a regular or associate member in good standing of the Alabama Associated General Contractors, Inc. ... and to satisfy any other membership requirements established from time to time by the Board of Trustees [of the AGCSF].”

. We also note that one of the purposes of the Guaranty Act is "to assist in the detection and prevention of insurer insolvencies.” There is no indication in the record that the AIGA plays any role in detecting or preventing the insolvency of groups such as the AGCSF or the Reinsurance Trust Fund.

. Based on the record before us, the Reinsurance Trust Fund is nothing more than a group of self-insured-employer groups that have pooled their workers’ compensation liability risks for purposes of “excess coverage” of the various member groups' workers' compensation claims. The Reinsurance Trust Fund is regulated by the Department of Industrial Relations, see Ala. Admin. Code (Department of Industrial Relations), r. 480-5-1-.04. There is no indication that the Department of Insurance considers a § 25-5-9(b) group to be an insurer for purposes of Title 27.

. The AIGA has not discussed the administrative regulations promulgated by the Department of Industrial Relations. The regulations require a self-insured employer to "maintain specific excess insurance coverage for its workers’ compensation liability.... Reinsurance may not be substituted for excess coverage," and the excess insurance must be obtained from an insurance company admitted to transact insurance business in Alabama by the Department of Insurance. Ala. Admin. Code (Department of Industrial Relations), r. 480-5-2-.02(5)(d) (emphasis added); see also Ala. Admin. Code (Department of Industrial Relations) r. 480-5-l-.04(l)(a) (excess insurance policy must be "issued by an admitted insurance company").
Likewise, the general rule is that a self-insured-employer group formed pursuant to § 25-5-9(a) must obtain excess insurance from an admitted insurance company, see Ala. Admin. Code (Department of Industrial Relations), r. 480-5-3-08(3) (self-insured-employer groups are "required to obtain specific excess insurance” and "may obtain aggregate excess insurance"); Ala. Admin. Code (Department of Industrial Relations), r. 480-5-3-.06(h) (defining "specific excess insurance” as "[insurance which provides that the excess insurer pays on behalf of or reimburses a [self-insured-employer group] for its payment of benefits on each occurrence in excess of the retention up to the amount of the excess insurer’s limit of liability” (emphasis added)); Ala. Admin. Code (Department of Industrial Relations), r. 480-5-3-06(0 (defining “aggregate excess insurance” as “[¡Insurance which provides payment on behalf of or reimburses a [self-insured-employer group] for its payment of benefits on claims incurred during a policy period in excess of the aggregate retention amount up to the excess insurer’s limit of liability” (emphasis added)).
There is an exception to the general rule, however. A self-insured-employer group "that become[s] [a] member[ ] of any Alabama reinsurance trust fund, as allowed by [§ ] 25-5-9(b), Code of Ala. 1975, as last amended, shall not be required to provide other excess insurance during the period of time in which they are members of the reinsurance trust fund.” Ala. Admin. Code (Department of Industrial Relations), r. 480-5-l-.04(2). It might be inferred from the use of the term "other” in r. 480-5-1-04(2) that the Department, of Industrial Relations considers a § 25-5-9(b) group to be providing "excess insurance” to its member groups. Because the policy issued by the Reinsurance Trust Fund has not been offered in evidence, however, it is not possible to conclude whether that policy actually is "excess insurance.”
We also note that a self-insured-employer group may obtain reinsurance, see Ala. Admin. Code (Department of Industrial Relations), r. 480-5-3-08(13)(b), and an Alabama reinsurance trust fund created pursuant to § 25-5-9(b) may obtain reinsurance. See Ala. Admin. Code (Department of Industrial Relations), r. 480-5-l-.04(3)(b). Again, it might be inferred from these regulations that, so far as the Department of Industrial Relations is concerned, both a § 25-5-9(a) self-insured-employer group and a § 25-5-9(b) group are considered to be providing insurance to their participants, otherwise it would be incorrect *210 to classify insurance they obtain as reinsurance. We need not defer to the Department of Industrial Relations classifications for purposes of Title 27, however, because it is not the agency charged with the administration of that Title. See Ex parte State Dep't of Revenue, 683 So.2d at 983 ("[A] court accepts an administrative interpretation of the statute by the agency charged with its administration, if the interpretation is reasonable.”). Further, as hereinafter discussed, the fact that the Reliance policy might be classified as reinsurance does not mean it is not direct insurance for purposes of the Guaranty Act.

. In addition to the argument discussed in the text, the AIGA seeks to rely upon the terminology used in the certificate of insurance issued by Reliance, which includes refer-enees to reinsurance. The question before us, however, is whether the law considers a policy such as the Reliance policy to be one of direct insurance or reinsurance.

. The AIGA also directs us to dicta in South-Trust Bank of Alabama, N.A. v. Alabama Life & Disability Insurance Guaranty Ass'n, 578 So.2d 1302 (Ala.1991), in an attempt to support its argument. Because the portion of the SouthTrust opinion upon which the AIGA seeks to rely is dicta, because it does not reflect a consideration of the nature of reinsurance, and because it is inconsistent with the rationale discussed above, we decline to adopt it as determinative of the issues before us.